**BOCA RATON COMMUNITY HOSPITAL, INC., et al.,**
Plaintiffs,

v.

**TENET HEALTHCARE CORPORATION,**
Defendant.

No. 05–80183–CIV–SEITZ/MCALILEY.

United States District Court,
S.D. Florida.

Aug. 2, 2007.

Ann C. Turetsky, Hal M. Hirsch, John F. Triggs, Kenneth A. Lapatine, Richard A. Edlin, Greenberg Traurig, New York, NY, Arthur R. Miller, Harvard University, Cambridge, MA, David A. Coulson, Hilarie Bass, Greenberg Traurig, Miami, FL, David K. Isom, Greenberg Traurig, Denver, CO, Robert P. Charrow, William B. Eck, Greenberg Traurig, Washington, DC, for Plaintiffs.

Brett Alan Barfield, Martha R. Mora, Peter Prieto, Sanford Lewis Bohrer, Scott Daniel Ponce, Holland & Knight, Mark Alan Lavine, Wendy A. Jacobus, United States Attorney's Office, Miami, FL, Bridget K. O'Connor, Jay P. Lefkowitz, Jennifer G. Levy, Karen Natalie Walker, Patrick M. Bryan, Rebecca A. Koch, Susan E. Engel, Kirkland & Ellis, Daniel Spiro, David T. Cohen, Michael Granston, United States Department of Justice, Washington, DC, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFF'S EXPERT OPINION ON DAMAGES

SEITZ, District Judge.

This RICO case comes before the Court on Tenet Healthcare Corporation's ("Tenet") Motion for Summary Judgment [DE–326] and Motion to Exclude the Testimony of Plaintiff's Expert Joan DaVanzo and all Testimony Based on the So–Called "Lewin Model" [DE–301]. Having considered Tenet's motions, the responses and replies thereto, the *amicus curiae* brief of the United States and the record, the Court grants Tenet's motions for two reasons. First, Boca cannot establish proximate causation under RICO since Tenet's conduct did not directly cause Boca's alleged injury. Second, Boca's damages model does not fit its theory of liability and must be excluded; therefore Boca cannot prove damages.[1]

### I. Introduction

Plaintiff Boca Raton Community Hospital ("Boca") asserts that Tenet, a national healthcare corporation, in combination with 76 of its affiliated hospitals, implemented a scheme, commonly referred to as "turbocharging," to collect unlawful reimbursements from Medicare. According to Boca, Tenet made its Medicare cases appear to be extraordinarily costly, and therefore eligible for additional Medicare reimbursements known as "outliers,"

---

**1.** Material factual disputes defeat summary judgment on the other grounds Tenet raises.

merely by grossly overcharging for them rather than actually incurring high costs. The scheme succeeded because Medicare did not reimburse for these extraordinarily costly outlier cases by evaluating a hospital's actual costs, but rather by using a hospital's billed charges multiplied by the hospital's "cost-to-charge ratio," in what Medicare assumed would generate a reasonable approximation of the hospital's actual costs.

Because Tenet obtained so many excessive reimbursements, Boca claims that Medicare was forced ultimately to diminish the amount of outlier reimbursements available to Boca and other hospitals.[2] Boca's two-count Amended Complaint [DE–253] alleges that through its overcharging conduct Tenet engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and a conspiracy to do so in violation of 18 U.S.C. § 1962(d), both predicated on Tenet's receipt and/or transport of stolen or converted funds from Medicare in violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. §§ 2314–15.[3]

Tenet's summary judgment motion attacks Boca's ability to meet its burden to prove RICO proximate causation, as well as its burden to establish the existence of a RICO enterprise or conspiracy. Tenet also moves for judgment based on Boca's inability to prove the impact of Tenet's overcharging on Medicare, and damages to Boca therefrom, because Boca's expert's methodology for calculating such impact does not "fit" Boca's liability theory. Thus, this order addresses Tenet's pending *Daubert* motion to the extent necessary to resolve the motion for summary judgment. Tenet also challenges the assertion that it violated the outlier program and that such transgression amounts to a violation of the NSPA. Finally, Tenet moves for summary judgment on its affirmative defenses of unclean hands and "advice of counsel."

Although Boca's RICO claims are insufficient as a matter of law to prevail against Tenet in this case, it bears emphasizing that Tenet escapes Boca's grasp not because its conduct is blameless, but only because Boca is not the proper entity, and RICO not the proper legal vehicle, to redress the harm Boca targets. The evidence in this case paints a clear picture of unmitigated corporate greed. Tenet's shameless appetite for profit at the expense of a taxpayer supported medical system designed to benefit the less fortunate in society is unconscionable. Fortunately, the government finally caught on to the perversion of the outlier program and amended the Medicare regulations to eliminate some of the potential for abuse. The United States also sued Tenet to recover for the same overcharging scheme Boca identifies.[4] Thus, the narrow question be-

---

2. Boca filed the case as a class action on behalf of all acute care hospitals in the nation that received Medicare outlier reimbursements between the years 1999 and 2003, however, the Court denied Boca's motion for class certification. *See* DE–324.

3. The Court dismissed Boca's claim for unjust enrichment, *Florida v. Tenet Healthcare Corp.*, 420 F.Supp.2d 1288, 1308–09 (S.D.Fla.2005), and Boca voluntarily dismissed its claims for fraud and for violation of California's Unfair Competition Law, § 17200, Cal. Bus. & Prof. Code. *Id.* at 1296 n. 7; *see also* DE–255 p. 3 n. 4

4. The United States sued Tenet in the Central District of California to recover excessive outlier funds paid to Tenet as a result of, *inter alia*, Tenet's alleged scheme to increase outlier reimbursements by increasing charges without relation to costs. *See* DE–258, Ex. B (redacted Settlement Agreement). The government's case settled in June of 2006 for approximately $900 million, $800 million of which represented excessive outlier payments. *See id.* at 6.

fore this Court is not whether Tenet is liable to the government for the alleged theft, or to the individuals forced to pay outrageously high medical bills as a result of the overcharging,[5] but rather whether Boca, as Tenet's competitor, can recover its own damages from Tenet for the alleged theft from Medicare.

## II. Background[6]

Medicare is a system of health insurance for the nation's 40 million aged and disabled administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services ("CMS"). *See United States v. R & F Properties of Lake Co., Inc.*, 433 F.3d 1349, 1351 (11th Cir. 2005). The relevant provisions of Medicare set forth a system of payments for the operating costs of acute care hospital inpatient stays. Under this system, a hospital is reimbursed at a fixed rate for its services regardless of the hospital's costs, thereby creating an incentive to keep costs in check. *See Fischer v. United States*, 529 U.S. 667, 685, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000). The fixed reimbursement rate is based on the patient's diagnosis, or diagnosis-related group ("DRG"). In a nutshell, Medicare pays each hospital a predetermined average cost reimbursement for a particular DRG (a "DRG payment"), adjusted for various factors like the geographic location of the hospital, local cost of living, wage rates and the like.

The outlier program, the program at issue in this case, was designed to supplement the basic fixed reimbursement scheme described above. Whereas the basic DRG payment system sets reimbursements for each DRG based on the average cost to treat that diagnosis, the outlier program recognizes that some cases will inevitably fall well above the average in terms of costs. Under the outlier program, a hospital may receive additional outlier payments when the costs it incurs to treat a patient exceed the standardized DRG payment by a fixed amount. *See* 42 U.S.C. § 1395ww(d)(5); 42 C.F.R §§ 412.80, 412.84; *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1009 (D.C.Cir. 1999). Specifically, the statute authorizes additional payments "in any case where charges, adjusted to cost, ... exceed the sum of the applicable DRG prospective payment rate plus [other fixed adjustments] plus a fixed dollar amount determined by the Secretary." 42 U.S.C. § 1395ww(d)(5)(A)(ii). In other words, when the standard DRG payment does not cover the hospital's costs, then the hospital must absorb them unless they are so extraordinary that they exceed the Fixed Loss Threshold or "FLT." If they exceed the FLT, which acts like an insurance deductible, then the case is considered a "cost outlier" and the hospital is eligible to receive a large percentage of those costs that fall above the FLT as outlier reimbursements.

---

**5.** Since the outlier funds at issue in this case are calculated based on the actual charges hospitals like Tenet imposed for their services, those hospitals had to increase their charge-master rates—or their "stickerprices"—in order to claim higher outlier reimbursements. Thus, in addition to the direct impact on the government, individuals without insurance or other third-party benefits were stuck paying the high chargemaster rates bearing little relationship to the actual cost of the services.

The impact of Tenet's conduct on these individuals is not the subject of this litigation.

**6.** This background statement is drawn largely from the joint statement the parties submitted in connection with Boca's motion for class certification. *See* DE–313 (Parties' Joint Background Statement Regarding Outlier Payment System). The Court set forth a more detailed account of the underlying Medicare program in its Order Denying Class Certification [DE–324].

## A. The Fixed Loss Threshold

The FLT is a dollar amount threshold that distinguishes an exceptionally costly outlier case from an average-cost DRG case. If a hospital incurs costs above the FLT, then that hospital can recover a significant percentage of the additional costs as an outlier reimbursement. The CMS establishes the FLT annually by rule making according to a methodology which estimates what FLT level will keep total outlier payments within the statutory limits. CMS is constrained by statute to make outlier reimbursements at no less than 5% and no more than 6% of the total aggregate DRG payments for any given year. See 42 U.S.C. 1395ww(d)(5)(A)(iv). For the years at issue in this case, CMS set the total outlier payment target at 5.1%. See 68 Fed.Reg. at 34501. Nevertheless, despite the statutory mandate not to pay out more than 6%, and even with the regulatory target of 5.1%, CMS paid out between 6.1% and 7.6% for the years at issue. See 68 Fed.Reg. 34496; see also id. at 10423.

According to Boca, CMS calculated the FLT for any given year using an "iterative process." See DE–258, Ex. A (DaVanzo Report) at 15. As Boca's counsel has explained, CMS began with an educated guess about what FLT level would meet the target total outlier payment of 5.1%. CMS then used that "best-guess" FLT to estimate total outlier payments by calculating the predicted number of claims for the upcoming year based on historical data. If the estimated total payments exceeded 5.1%, then CMS would adjust the FLT upward to reduce the predicted overall payments. CMS proceeded in this trial and error fashion until it found the proper estimated FLT level that would result in predicted total outlier payments of 5.1%. Despite its best efforts at predicting the

appropriate FLT for each year, CMS consistently missed the 5.1% and 6.0% targets and therefore had to increase the FLT each year. The FLT increased from $14,600 in 2000 to $33,560 in 2003. See 68 Fed.Reg. 34496. Thus, despite an ever increasing FLT, CMS was consistently paying out more outlier reimbursements than it expected, and more than the Medicare statute allowed.

## B. The Cost–to–Charge Ratio

Although the outlier program is designed to reimburse hospitals for extraordinary costs, during the relevant time frame, outlier payments were not calculated according to a hospital's actual costs for the services. Instead, a hospital's costs were approximated by multiplying its charges (i.e., what it billed its patients) by its cost-to-charge ratio ("CCR"). See 42 U.S.C. § 1395ww(d)(5)(A)(ii);42C.F.R. §§ 412.84(g), (h). Application of this formula for approximating actual costs from billed charges set the stage for hospitals to manipulate their charges to create the appearance of increased costs.

A hospital's CCR is derived from its most recent audited or "settled" cost report. Importantly, during the years at issue, it took from two to five years to audit and settle a hospital's cost reports. Therefore, the CCRs CMS used to calculate outliers were outdated by many years and did not necessarily reflect the hospital's current charges or costs for a particular case. See 68 Fed.Reg. at 34500–01. This meant that an increase in billed charges without a corresponding increase in costs would result in the appearance that costs had increased when in fact they had not. This is one of the ways in which hospitals received outliers without regard to actual costs.[7]

---

7. Keep in mind that outliers are the product of billed charges and CCRs. Therefore, an increase in a hospitals' billed charges, with-

out a corresponding decrease in the CCR due to the time lag, results in higher outlier reimbursements.

## C. The National Threshold

Another means of manipulating charges to recover excess outliers occurred through the application of the National Threshold. Near the end of each of its fiscal years, CMS calculated a national average of all hospitals' settled CCRs. Using this national average, CMS calculated a high and a low National Threshold CCR—the low National Threshold was calculated as three standard deviations *below* the national average settled CCR, and the high National Threshold was calculated as three standard deviations *above* the national average settled CCR. 53 Fed.Reg. 38476, 38503 (Sept. 30, 1988). CMS assumed that hospital-specific CCRs falling outside this range—three standard deviations above and below the national average CCR—were "unreasonable, in that they [we]re probably due to faulty data reporting or entry, and should not be used to identify and pay for cost outliers." 53 Fed.Reg. at 38503. Therefore, if a hospital's settled CCR fell below the low National Threshold (or was above the high National Threshold), CMS instructed fiscal intermediaries to use a state-wide average ("SWA") CCR in lieu of the hospital-specific CCR for purposes of calculating outlier payments. *See* 67 Fed.Reg. 49982, 50125 (Aug. 1, 2002); *see also* 53 Fed.Reg. at 38503 (proposing use of the SWA CCR for those hospitals whose CCRs fell more than 3 standard deviations above or below the National Threshold). The SWA CCR was calculated as the weighted average of hospital-specific CCRs in a given state. Therefore, if a hospital's settled CCR fell below the low National Threshold it was assigned a higher SWA CCR by its fiscal intermediary and that hospital would then receive more outlier payments than if its own settled CCR had been used.[8]

## D. CMS Promulgated New Rules Governing the Outlier Program in 2003

In March 2003, CMS proposed regulatory changes to the outlier payment system. *See* 68 Fed.Reg. at 10420. These proposals became final regulations effective prospectively on August 8, 2003. *See* 68 Fed. Reg. at 34494. The new regulation from CMS made three key changes to the outlier payment system.

First, the amendments allow the fiscal intermediary to calculate outlier payments using a cost-to-charge ratio based on a more current cost report. *See* 42 C.F.R. § 412.84(i)(2). In particular, CMS instructed (for discharges occurring on or after October 1, 2003) that the operating and capital cost-to-charge ratios applied at the time a claim is processed must be based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period. 42 C.F.R. § 412.84(i)(2). CMS explained that this would tie outlier payments more closely to actual costs, because the hospital's billed charges (which reflect charge increases) would be adjusted by cost-to-charge ratios that also reflected recent charge increases. *See* 68 Fed.Reg. at 34497.

Second, CMS "remove[d] the existing requirement that a fiscal intermediary [ ] assign a hospital the statewide average cost-to-charge ratio when the hospital has a cost-to-charge ratio that falls below the floor." 68 Fed.Reg. at 34500. Thus, "[h]ospitals will receive [outlier payments based on] their actual cost-to-charge ratios, no matter how low their ratios fall." *Id.; see also* 42 C.F.R. § 412.84(i)(3).

Third, CMS made outlier payments subject to reconciliation on a case-by-case ba-

---

8. Keep in mind that outliers are the product of billed charges and CCRs. Therefore, an increase in a hospitals' CCR, by operation of the SW CCR, also results in higher outlier reimbursements.

sis. *See* 42 C.F.R. § 412.84(i)(4). CMS explained that this would ensure that "outlier payments would be based on the relationship between the hospital's costs and charges at the time a discharge occurred." 68 Fed.Reg. at 34501.

The amended outlier payment regulations thus implemented a formula designed to "ensure that when final outlier payments are made, they . . . reflect an accurate assessment of the actual costs the hospital incurred." *Id.* CMS, however, did not retroactively adjust outlier payments; the new regulations apply prospectively only. 42 C.F.R. § 412.84(h); *see also* 68 Fed.Reg. at 34505, 34512, 34515.

### E. Boca's Theory of Liability

Viewed in the light most favorable to Boca, the evidence in the record supports Boca's allegations that between 1999 and 2003 Tenet increased its outlier reimbursements by dramatically increasing the amounts it charged for its hospital services without reference to any real cost increases, thereby transforming its average-cost cases into apparently more costly outlier cases. *See generally* DE–357 (Plaintiff's Statement of Material Facts), pp. 2–6. According to Boca, Tenet's outlier reimbursements rose from approximately $231 million in 1999 to almost $831 million in 2003. *See* DE–258, Ex. A (DaVanzo Report) at 22. Tenet's success at increasing its outlier reimbursements followed from two facts. First, at the time, CMS used outdated CCRs that did not reflect the Tenet hospital's dramatic price increases. And second, some of the Tenet hospitals with CCRs below the low National Threshold had their CCRs increased to the higher SWA CCR. The evidence supports the conclusion that Tenet consciously took advantage of the time lag and the SWA CCR to increase its total outlier reimbursements. *See* DE–357, p. 5. Boca claims that since Tenet's charge increases were unrelated to actual increases in costs, the outlier funds it derived from those increased charges were unlawful and constitute a violation of RICO sections 1962(c) and 1962(d). As the RICO predicate acts, Boca alleges that Tenet transported or received stolen or converted outlier funds in violation of 18 U.S.C. §§ 2314 and 2315.

Boca's theft claim rests on its argument that when a hospital's CCR falls below the low National Threshold line, any outliers that the hospital receives are stolen, but when the hospital's CCR remains above the low National Threshold line then the outlier reimbursements are lawful. Boca thus attempts to distinguish Tenet's charge increasing conduct from the charge increases of other hospitals by focusing on the fact that many Tenet hospitals' charge increases caused their CCR's to drop below the low National Threshold.

Boca claims that Tenet's overcharging of Medicare injured Boca because Tenet's excessive outlier reimbursements forced CMS to increase the FLT over the relevant time period in an effort to keep total outlier payments in line with the statutory maximum limit of 6%. Because Tenet's turbocharging increased the FLT, Boca maintains that it lost out on outlier reimbursements for its own cases. In order to prove its damages, Boca's experts purport to calculate the amount of excessive outlier reimbursements Tenet received for each year by replacing Tenet's audited CCRs (the ones CMS used in calculating outliers) with Tenet's "actual" or unaudited CCRs. *See* DE–255, p. 8, 12; DE–258, Ex. A (DaVanzo Report) at 25. From this they derive a "Tenet-adjusted FLT" and use it to recalculate Boca's outlier reimbursements. *See id.*

### III. DISCUSSION

#### A. Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is met, the non-moving party must go beyond the pleadings and "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). In so doing, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369(11th Cir.1998) (citations omitted). The Court must then decide whether " 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

With these principles in mind, the Court turns to the parties' arguments.

**B. Boca's RICO Claims Fail Because Tenet's Conduct Did Not Directly Cause Boca's Claimed Injury.**

 Tenet's lead argument is that Boca's RICO claims fail because Boca cannot prove that Tenet's overcharging conduct was the proximate cause of Boca's lost outlier payments. The RICO statute provides a cause of action for persons injured "by reason of" a defendant's racketeering activity.[9] The U.S. Supreme Court has construed the "by reason of" language to impose a proximate cause requirement whereby a RICO plaintiff must demonstrate that its alleged injury is the direct result of defendant's conduct. *See Anza v. Ideal Steel Supply Corp.*, —— U.S. ——, ——, 126 S.Ct. 1991, 1996, 164 L.Ed.2d 720 (2006); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[10] When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation

**9.** Title 18, United States Code, Section 1964(c) reads in pertinent part: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover three-fold the damages he sustains...."

**10.** "Proximate cause" is shorthand for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268, 112 S.Ct. at 1317–18. Boca invites the Court to employ the "substantial contributing factor" formulation of proximate cause. While such a formulation is one of "the many shapes this concept took at common law," it does not alter the "demand for some direct relationship between the injury asserted and the injurious conduct alleged." *Id.*

led directly to the plaintiff's injuries. *Anza,* 126 S.Ct. at 1998.

Whether particular conduct is a direct cause of an injury instead of an indirect cause is not susceptible of exact determination because there is no precise proximate cause algorithm. *See Holmes,* 503 U.S. at 268–70, 112 S.Ct. 1311. Rather, the directness or continuity between the defendant's conduct and the plaintiff's injury turns on the facts of each case and, according to the Supreme Court's most recent gloss, should be analyzed with three dominant considerations in mind. *Anza,* 126 S.Ct. at 1997–98. First, a court should consider the degree of attenuation between the RICO violation and the asserted injury. That is to say, a court should inquire whether there were factors other than the defendant's conduct which could have contributed to the plaintiff's injury. *Id.* at 1997. Second, a court should consider whether the damages caused to plaintiff by defendant's conduct would be difficult to ascertain. *Id.* at 1997–98. And third, a court should consider whether a more directly injured party than the plaintiff is in a better position to vindicate the underlying violation of the law. *Id.*

Applying these considerations in *Anza,* the Supreme Court reversed the lower courts' failure to dismiss RICO claims brought by one business (Ideal) against its competitor (National). The RICO violation Ideal alleged was that National's owners (the Anzas) conducted National's affairs through a pattern of mail and wire fraud. Specifically, Ideal claimed that National failed to pay New York state sales tax and that the Anza's submitted fraudulent tax returns to the State of New York. That conduct caused lost revenues to Ideal by allowing National to unfairly undercut Ideal's prices and out-compete Ideal for business. The Supreme Court reversed because it concluded that Ideal's lost revenue was not sufficiently connected to Na-

tional's fraud to meet the direct causation requirement. The Court explained that the direct victim of the fraud was the State of New York and that New York was capable of recovering for the direct injury; National's prices and Ideal's lost revenues were the product of multiple factors unrelated to the fraud; and calculating Ideal's lost revenue was too speculative. As such, the Court ruled that proximate cause was lacking and dismissal required.

Similarly, in *Holmes* the Supreme Court reversed the lower courts' failure to dismiss RICO claims brought by account holders of bankrupt broker-dealers against defendants who manipulated stocks held by the broker-dealers. Plaintiffs alleged that the defendants' stock manipulation forced the broker-dealers into insolvency, which in turn rendered the broker-dealers unable to meet their obligations to the plaintiffs. The defendants' mail fraud formed the predicate for the RICO claims. The Supreme Court found the links between the defendants' conduct and the ultimate impact on the non-purchasing account holders too tenuous to meet the direct causation requirement of RICO. Many factors could have contributed to the broker-dealers' insolvency; it was too difficult to sort out and calculate the impact of the fraud on the plaintiffs' accounts; and the broker-dealers (those directly injured by the fraud) could be counted upon to seek legal redress for the stock manipulation.

Although the facts of this case are unique, *Anza* and *Holmes* offer considerable guidance and strongly suggest that dismissal of Boca's RICO case is warranted. In fact, one district court to have ruled on the exact same RICO claims Boca raises here has concluded that proximate cause is absent. *See Longmont United Hospital v. Saint Barnabas Corp.,* No. 06–2082, 2007 WL 1850881 (D.N.J. June 22,

2007). After thoroughly considering Boca's RICO claims in light of the three *Anza* factors, it is unmistakable that Tenet's alleged theft from CMS did not directly cause Boca's alleged loss of outlier reimbursements.

### (1) Tenet's overcharging is too attenuated from Boca's alleged lost outlier payments to constitute a direct cause of Boca's injury.

Given the operation of the outlier program, Tenet's receipt of funds from Medicare (whether characterized as a theft or not) had no immediate impact on Boca. The outlier program is not a discrete, quantified "pool" of funds, such that money taken by one hospital would automatically take funds specifically designated for another eligible hospital. Rather, the impact of excessive payments to Tenet only impacted Boca's bottom line through the mechanism of the FLT, which operates something like an insurance deductible. Instead of a direct connection between Tenet's theft and Boca's harm, Tenet's conduct merely played a role in triggering a chain of events that eventually contributed to Boca's lost outlier reimbursements by increasing the FLT "deductible."

First, Tenet had to raise its charges. Such charge increases can be the result of many factors besides the desire to increase outlier reimbursements. While there is evidence that Tenet imposed some across-the-board price hikes for no other reason than to increase its outlier reimbursements, there is no evidence that all price increases for all Tenet hospitals over the applicable four year period were solely the result of a scheme to siphon off outliers from Medicare. Failure to account for lawful price increases, or legitimate portions of those increases, complicates the relationship between Tenet's charging and Boca's subsequent lost outliers, and weakens the directness of the connection between the two. Like the diverse factors attributable to the price levels involved in *Anza,* factors other than the desire for outlier receipts contributed to Tenet's charges. This fact undermines the linkage between Tenet's charges and Boca's ultimate outlier reimbursements.

Next, Tenet's overcharging had to cause CMS to raise the FLT. It is undisputed, however, that Tenet hospitals were not the only ones to dramatically increase their charges and cause CMS's overall outlier payments to skyrocket above the statutory maximum level. As Tenet's experts point out, as much as 85% of acute care hospitals contributed to the bulk of the increase in the FLT. *See* DE–301, Ex. 14 (Palmer Decl.) p. 16; Ex. 12 (Palmer Report) p. 11. In fact, even if Tenet hospitals had received no reimbursements at all during the pertinent period, CMS would still have exceeded the 6% maximum and therefore would have increased the FLT. *See* DE–169, Ex. A, (Boedeker Decl.) ¶ 10; DE–169, Ex. B, (Palmer Decl.) ¶¶ 30–34. Hence, many additional hospitals contributed to the increase in the FLT. Moreover, CMS's decision to raise the FLT was the result of its assessment of *cumulative* outlier overpayments to many hospitals, not simply to Tenet. Thus, one cannot say that Tenet was the direct or proximate cause of Boca's losses predicated on a rise in the FLT, when many hospitals impacted the FLT and the FLT would have risen even if Tenet hospitals had not received even one dollar in outlier funds.

It is also clear that outlier overpayments were not the only factor behind CMS's decision on the appropriate level to set the FLT. Indeed, according to federal regulation, CMS was authorized to employ a variety of factors in setting the FLT, including CMS expectations of the healthcare inflation rate and the rate of change of hospital charges and total spending, *see* 67 Fed.Reg. 49982, 50124 (Aug. 1, 2002);

66 Fed.Reg. 39828, 39941 (Aug. 1, 2001), as well public comment and other policy considerations. More importantly, which *combination* of factors went into the particular increases in the FLT throughout the time period in question is a matter of speculation. Aside from the statutory guideline that CMS not exceed the 6% ceiling, the decision about where to set the FLT in any given year was largely a matter of administrative discretion. In fact, despite its promises to do so, Boca never produced the "formula" or "methodology" CMS used to establish the FLT for any given year, except to say that it was the product of an "iterative process," which appears to mean that CMS made educated guesses about what level of FLT would result in a target payout percentage. Even accepting Boca's characterization of the process, it does not amount to the sort of automatic relationship needed to establish the requisite direct nexus between Tenet's overcharging, the rise in the FLT and Boca's lost outliers. This lack of a close relationship between Tenet's overcharging and CMS's changes in the FLT heightens the discontinuity between Tenet's alleged theft and the ultimate impact on the amount of Boca's outlier reimbursements. The attenuation between Tenet's initial increases in its charges and the ultimate amount of outlier reimbursements Boca received establishes the lack of a direct relationship between the two for purposes of RICO causation.

In sum, there are too many links in the chain between Tenet's charging conduct and Boca's receipt of outliers—and the bonds between these links are too weak because they are contingent on other factors—to meet the standard of directness required to satisfy RICO causation.

**(2) Ascertaining Boca's damages from Tenet's alleged theft is fraught with complication and speculation.**

Boca's theory of proving damages is overly simplistic for the realities of this case and is, in fact, untethered to its own theory of liability.[11] Although Boca's theory of liability is that Tenet overcharged CMS for its services in order to make its cases appear extraordinarily costly, Boca's experts make no effort to determine how much Tenet overcharged. This failure is fatal because Boca's damages flow from the excessive outliers paid to Tenet because of its unreasonable pricing.

Rather than calculate the degree of Tenet's unreasonable pricing and use that figure to estimate the amount of excessive outliers attributable to Tenet's overcharging, Boca's experts simply apply CMS's 2003 regulatory changes to Tenet's conduct. That is, they simply use Tenet's actual costs, instead of its audited CCRs, to calculate the outlier reimbursements Tenet should have received. Boca never offers a justification for applying Tenet's actual costs as a way to replicate reasonable charges, or for applying different rules than existed at the time the conduct was committed in order to measure the effect of Tenet's charging conduct on the FLT. The experts' failure to do so appears to be based on the conceded difficulty of estimating what level of charging would have been reasonable. While Boca's experts initially set out to "develop an assumption about how charges for Tenet hospitals should have increased over [time]," (DE–301, Ex. 3), they later admitted that such an analysis presented "a little bit of a tricky question." *See* DE-(Dobson Dep.) p. 172–73. Boca's failure to

**11.** For a discussion of the reasons for excluding Boca's expert opinions on related grounds see, *infra,* pp. 16–19.

tie its damages to Tenet's overcharging ultimately renders Boca's experts' opinions inadmissible. It also highlights the inherent difficulty of calculating such damages.

### (3) The United States is in the best position to vindicate the underlying violations of the law and, in fact, has already recovered damages from Tenet for overcharging.

The alleged predicate acts here—Tenet's theft—were unequivocally directed at a third party, CMS. Tenet did not steal funds earmarked for Boca. Thus, just like the State of New York in *Anza*, CMS is in the best position to sue and recover for the alleged theft of outlier funds. In *Holmes*, the Supreme Court explained that the burden of unraveling the proximate cause problems in cases like this one is not justified by the general interest in deterring harmful conduct, since directly injured victims can typically be counted on to vindicate the law. 503 U.S. at 269–70, 112 S.Ct. 1311. While there is no hard-and-fast rule against allowing a RICO case to proceed simply because the government is harmed by the predicate acts, in post-*Anza* cases similar to this one, the courts have rejected attempts by aggrieved parties to recover against business competitors for harms directly caused to the government. *See James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396 (7th Cir.2006) (construction company could not bring a RICO suit against its competitor accused of bid-rigging; the court found that the state was in the best position to prosecute a suit to recoup lost funds from the bid-rigging, even though the competitor-plaintiff lost out on the construction contracts it would otherwise have received but for the scheme); *V–Tech Services v. Street*, 215

Fed.Appx. 93 (3rd Cir.2007) (rejecting the attempt by a disadvantaged business entity ("DBE") to bring a RICO claim against a contractor that allegedly committed wire and mail fraud in violating certain federal DBE regulations; the state was best positioned to vindicate defendants' efforts to evade the underlying DBE regulations).

A finding that the federal government is best able to vindicate an alleged theft from the outlier program is even more compelling in this case than in *Anza, James Cape,* or *Street* because the government not only can be expected to protect itself from theft, but it has already done so. CMS has recouped some $800 million from Tenet so far for excessive outliers, and may be counted on to recover even more from other hospitals that have engaged in similar schemes.[12]

In sum, the Court concludes that Boca cannot meet its burden of establishing RICO causation because (1) Tenet's conduct is too remote and attenuated from Boca's alleged injury; (2) Boca's indirect damages are too difficult to ascertain; and (3) the United States is in a much better position to protect Medicare from theft than Boca.

### C. Tenet's Motion to Strike Boca's Experts Supports Summary Judgment.

■ Tenet raises a number of objections to Boca's expert reports. *See* DE–301 (Motion to Exclude). The main thrust of Tenet's argument is that Boca's methodology for proving that Tenet's overcharging impacted the FLT, and subsequently injured Boca, does not "fit" its theory of liability because the two are fundamentally unrelated to one another. *See Daubert v.*

---

**12.** As noted in footnote 4, *supra,* Tenet's settlement with the United States resolved allegations that Tenet recovered outlier payments based on charge increases substantially in excess of any increase in the cost of the medical services. *See* DE–258 (Settlement Agreement) § II.E(*l* ). These are the same allegations on which Boca pins its recovery.

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under *Daubert,* Boca bears the burden of demonstrating that its expert's damage opinion "is relevant to the task at hand, ... *i.e.,* that it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir.1999) (citation omitted). Where the opinion does not advance the question in dispute for which the opinion is proffered there is no "fit" and the opinion should be excluded. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786; *see also McDowell v. Brown,* 392 F.3d 1283, 1299 (11th Cir. 2004). Because Boca fails to establish fit, its experts' opinion on damages must be stricken.

■ As stated above, Boca's theory of liability is that Tenet used the outlier program to steal from CMS by grossly increasing its charges, which in turn caused CMS to raise the FLT, which resulted in fewer outlier reimbursements for Boca. To calculate its damages from this overcharging, Boca's experts employ what they refer to as the "Lewin Model," a set of formulae purporting to replicate CMS's outlier payment methodology. In essence, the Lewin Model calculates Boca's damages by comparing the level of outlier reimbursements Boca actually received with an amount Boca would have received using a "Tenet-adjusted FLT."

The fatal flaw in Boca's theory lies in its inability to determine Tenet's impact on the FLT, because Boca never calculates the degree or amount to which Tenet allegedly overcharged in the first place. That is, Boca never distinguishes Tenet's lawful charging conduct from its unlawful charging conduct and therefore never calculates the amount of Tenet's conduct that unlawfully impacted the FLT. Instead of determining what would have been lawful, reasonable charges, Boca simply replaces the Tenet hospitals' audited CCRs (the figures CMS actually used in calculating its outlier payments) with these hospitals' unaudited CCRs for the particular years in question. As such, Boca's experts do not even apply the then-existing regulations, but rather they apply a different analysis than CMS actually used. In fact, as Boca's experts conceded on several occasions, they applied the post–2003 outlier regulations in determining Tenet's pre–2003 alleged outlier overpayments. *See* DaVanzo Dep. pp. 178–79; Dobson Dep. pp. 278–79; *see also* DE–320 p. 12 (explaining that "this is basically the change that was implemented by CMS in August of 2003.").

Showing the impact of Tenet's overcharging under a regulatory scheme than did not exist at the time does not advance a material aspect of Boca's case.[13] While it may be said that Boca's experts calculate a damage "estimate" of sorts, it is a not a calculation that is connected in any legally relevant way to the overcharging that allegedly injured Boca. In other words, Boca's analysis does not explain how Tenet's overcharging conduct impacted the FLT; it only shows how CMS's regulatory change operates. This is not the same as determining the amount of outliers Tenet would have received if it had charged some lesser reasonable amount for its inpatient care that would not qualify as a theft.

Replacing audited CCRs with unaudited ones does not accomplish the goal of determining what reasonable, lawful charges

---

13. The fact that this was not CMS's method of calculating outliers during the relevant period underscores that Boca's experts are not calculating the amount Tenet was overpaid under the then-existing regime, but rather how much Tenet would have received if CMS had applied a different set of regulations altogether.

would have been. Significantly, if the Tenet hospitals' charges had been reasonable their audited CCRs (the figure CMS actually used in calculating outliers) would not have been the same as their unaudited CCRs (the figure Boca's experts use). To see this, one need only look at Boca's own CCRs. Boca asserts that its charging conduct is reasonable and not unlawful. But Boca's audited CCRs (as used by CMS in calculating Boca's outliers) are not the same as Boca's unaudited CCRs. And according to the uncontradicted testimony of Tenet's experts, almost 85% of hospitals had unaudited CCRs that were higher than the audited CCRs CMS used in calculating their outlier reimbursements. *See* DE–301 Ex. 14 (Palmer Decl.) p. 16; Ex. 12 (Palmer Report) p. 11.

Had Boca's experts calculated what Tenet could have lawfully charged (in order to avoid what Boca calls theft) then one could conceivably calculate what Tenet's outlier reimbursements should have been without its overcharging, and also calculate what impact such reimbursements would have had on the FLT. The difference between the amount of outliers Tenet actually recovered (with high charges) and what Tenet would have recovered (with reasonable charges) would be an estimate one might use to measure the impact of Tenet's charging on the FLT, and ultimately on Boca. Boca simply did not undertake such an analysis, however, because Boca never took the first step of determining how much Tenet overcharged.[14]

In sum, Boca offers no opinion on what the FLT would have been if Tenet had imposed charges that were reasonably related to costs (i.e., lawful charges). Since Boca's experts' opinion is in effect based on the 2003 regulations, it "does not relate to any issue in the case [and] is not relevant and, ergo, non-helpful" and inadmissible. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. In fact, if admitted, Boca's expert opinions would confuse and mislead the jury by impermissibly purporting to measure Tenet's impact on the FLT, and Boca's damages, under the pre–2003 outlier regulations. For these reasons, the Court grants Tenet's motion to exclude the Lewin Model insofar as it does not fit Boca's theory of liability. Without evidence to prove how Tenet impacted the FLT, and consequently that Tenet caused Boca's damages, Tenet is entitled to summary judgment. *See Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1312 (11th Cir.1999).

### D. The Outlier Program Requires that Charges Bear Some Rational Relationship with Costs and Fact Questions Exist as to Whether Tenet Violated the NSPA.

As part of its RICO theory, Boca asserts that Tenet committed theft when its hospitals overcharged Medicare and drove their CCRs down below the low National Threshold, and that Tenet's transportation of these stolen funds violated the National Stolen Property Act ("NSPA"), 18 U.S.C.

---

**14.** Boca tries to deflect Tenet's argument with the statement that "outliers are predicated on costs, not charges," and therefore Tenet's focus on charges is beside the point. DE–320 p. 12. This statement goes to the heart of Boca's problem. Even though outliers might have been intended to compensate hospitals for extraordinary costs, they were calculated based on charges. Therefore, Boca's expert is incorrect when he states that outliers are paid based on costs not charges. *See id.* p. 12 n. 19 (quoting from the deposition of Boca's

expert Randall Haught). If outliers had actually been paid based on costs, as they are now after the 2003 regulatory change, then neither Tenet nor any other hospital would have had the opportunity to take advantage of the system. Thus, while Boca's effort to apply the regulatory change (which looks at actual costs) retrospectively may be sound from a policy perspective, it is not sound as a means of calculating the impact of Tenet's conduct prior to the regulatory change in 2003.

§§ 2314–15. Tenet attacks this position in two ways. First, Tenet argues that no outliers were stolen because the outlier program places no limit on what a hospital can charge. Second, Tenet contends that even if it did unlawfully overcharge in violation of the outlier program, such conduct does not violate the NSPA because CMS consented to the payments. Both arguments fail because (1) as a matter of law, the outlier program requires some reasonable relationship between charges and costs and (2) there exist material factual disputes about whether CMS consented to Tenet's reimbursements.

## 1. The outlier program requires some reasonable relationship between charges and costs.

Tenet's first argument, simply put, is that even if it intentionally inflated its charges solely in an effort to procure large outlier reimbursements from CMS, Tenet did no wrong because there is no express prohibition on such conduct in the statute or the regulations. It is true that the outlier program does not expressly prohibit or limit the rates a hospital can charge for its services. It is also true that Tenet did comply with the outlier program insofar as it submitted its actual charges for its services rather than somehow falsifying its true charges or the actual services it rendered. The real question, however, is not whether Tenet can charge what it wants for its services, but whether it can seek outlier reimbursements where its charges were greatly increased without any reference to increased costs. The short answer is no.

There must be *some* reasonable relationship between charges and costs, so that the charges submitted to CMS and used to calculate outliers actually represent some reasonable approximation of a hospital's costs. The language, structure and history of the statute supports this interpretation. The outlier statute provides that

hospitals may seek outliers when their "charges, *adjusted to costs*, exceed [the outlier threshold]." 42 U.S.C. § 1395ww(d)(5)(A)(ii) (emphasis added). Clearly, the statute does not envision paying out additional reimbursements merely for a hospital's charges that exceed a certain threshold. To read the statute the way Tenet does one must ignore the statutory reference to costs altogether, contrary to the rule of construction that requires a court to give effect to every word in the statute. *See Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1204 (11th Cir.2007). Indeed, the very next section of the statute specifically requires that outliers "shall ... approximate the *marginal cost of care* beyond the [outlier threshold]...." 42 U.S.C. § 1395ww(d)(5)(A)(iii) (emphasis added). Outliers based solely on increased charges do not approximate the marginal cost of care.

Tenet's position also disregards the obvious fact that the outlier program works in conjunction with the basic prospective payment system to provide *additional* payments, beyond the basic DRG payment, to hospitals which incur costs that exceed a particular threshold. It makes no sense to pay a basic fixed amount for a particular DRG, but then also make additional reimbursements to hospitals simply because these hospitals charge more. *See Lowery*, 483 F.3d at 1204 (courts must view the disputed provision in the context of the statute as a whole). Indeed, when Congress authorized the outlier program it did so with the express recognition that "there will be cases within each [DRG] that will be extraordinary costly to treat ... because of severity of illness or complicating conditions, and [will] not [be] adequately compensated for under the DRG payment methodology." S.Rep. No. 98–23 p. 51 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 191. CMS similarly has acknowledged that outlier payments should be paid only

for "cases that have extraordinarily high costs, and not merely high charges." 53 Fed.Reg. 38476, 38503 (Sept. 30, 1988). The fact that CMS used billed charges to approximate costs, however short-sighted that might appear in hindsight, does not mean that outlier reimbursements were meant to be untethered to costs.

Tenet's reliance on the Court's previous class certification ruling to support its position here misapprehends that order. In the class order, the Court found that Boca's use of the low National Threshold line as the dividing point between those hospitals that stole from the outlier program and those that were victims of the theft was untenable because it excluded hospitals from liability, and from the proposed class, that had a definite negative impact on the FLT and total outlier reimbursements. The Court never purported to rule, however, that a hospital with charges below the low National Threshold had not violated the regulations, only that it was clear that many other hospitals with higher CCRs than Tenet also contributed to the increased FLT. Indeed, the Court suggested that if CCRs were used to determine liability for overcharging, then CCRs higher than the low National Threshold line ought to be the standard. As such, the Court's class order does not support Tenet's view that its overcharging is lawful. Accordingly, Tenet's motion for summary judgment on this ground is denied.[15]

### 2. CMS did not consent to pay excessive outlier reimbursements for high charge cases.

In the alternative, Tenet argues that even if its conduct was unlawful, it cannot

constitute a violation of the National Stolen Property Act. To establish liability under the NSPA, Boca must establish that Tenet willfully or knowingly received or transported stolen outlier funds. *See Tenet*, 420 F.Supp.2d at 1304. Tenet argues that because CMS consented to the reimbursements Boca cannot prove the outlier funds were stolen, within the meaning of the NSPA. While CMS made the reimbursements in question, this fact alone does not mean that CMS consented to the underlying overcharging that led to the overpayments. Obviously, until CMS learned that hospitals were raising their charges without any connection to cost increases, it kept making outlier payments. But it is no answer to say that because CMS had all the raw data on hand to figure out the scheme, but did not do so, that it thereby consented. Given the complex nature of the outlier program, it is not surprising that it took CMS several years to comprehend the scope of the abuses. Importantly, once CMS did figure out that hospitals were bilking the system, it modified the rules to eliminate the very conduct Tenet argues CMS consented to. Moreover, the government sued Tenet to recover the outlier payments Tenet received. Had CMS known the truth, it appears that CMS would not have made the outlier reimbursement payments in question. At the very least, there is a fact question about whether CMS consented.

### E. Fact Questions Exist as to Whether Tenet was Involved in a RICO Enterprise.

 Tenet argues that Boca cannot establish a *prima facie* RICO violation because Boca has not, and cannot, show two

15. The Court need not, and expressly does not, draw any firm lines between lawful and unlawful charging conduct here. What is decided is that a hospital must have at least *some* reasonable relationship between its

costs and its charges in order to recover outlier reimbursements and that Tenet's charges were so disconnected to its costs, as evidenced by its low CCRs, that summary judgment cannot be granted.

distinct RICO entities—a person and an enterprise. RICO makes it "unlawful for any *person* employed by or associated with any *enterprise* . . . to conduct or participate, directly or indirectly . . . [in racketeering activity]." 18 U.S.C. § 1962(c) (emphasis added). This statutory language imposes a "distinctness" requirement whereby the "person" and the "enterprise" identified must be separate and distinct entities. *See Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); *see also United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1274–75 (11th Cir.2000). While the law clearly prohibits RICO liability where the person and the enterprise are alleged to be one and the same, the law is equally well-settled that a defendant can be both a person under RICO and also part of the RICO enterprise. *See Kushner,* 533 U.S. at 163, 121 S.Ct. 2087 (CEO and sole shareholder could be RICO person and also part of RICO enterprise consisting of himself and the company); *see also Goldin,* 219 F.3d at 1275 ("[A] defendant can clearly be a person under [the RICO] statute and also be *part* of the enterprise. The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise.") (emphasis in original) (multiple citations omitted). Here, the issue is slightly different than in *Kushner,* the question is whether it is possible for a company (like Tenet) to be employed by or associated with other corporations (like the affiliated hospitals). In this circuit, the answer is yes. *See Goldin,* 219 F.3d at 1276 (finding that three related corporations could each be RICO persons and also collectively be a RICO enter-

prise). In particular, the *Goldin* court ruled that "the fact that each corporation was a defendant 'person' and also part of the union of corporations which was the enterprise does not as a matter of law preclude conviction." *Id.* (citation omitted).

However, mere corporate separateness is not necessarily sufficient to establish a distinct RICO person and enterprise. The cases show that in certain limited circumstances different corporate entities can be viewed as indistinct for RICO purposes. *See, e.g., Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055 (2d Cir.1996) (subsidiary organized and acting solely as purchasing agent for related corporate entity was indistinct under RICO).[16] But as *Goldin* establishes, the key to distinctness depends less on whether the corporations are separate in the formal legal sense and more on whether the corporations are free to act independently of each other and to advance their own separate interests. 219 F.3d at 1277 (finding corporations distinct where "[e]ach is free to act independently and advance its own interests contrary to those of the other two corporations."). Hence, the question is whether there is sufficient evidence in the record from which a jury could reasonably conclude that Tenet and its affiliated hospitals were free to act independently of each other and to advance their own interests.

This record, viewed in the light most favorable to Boca, contains sufficient evidence that Tenet and the affiliated hospitals are distinct for RICO purposes, and Boca therefore survives Tenet's summary judgment motion. First, Boca identifies evidence to establish that each of the hos-

---

**16.** Boca suggests that *Discon* does not survive the U.S. Supreme Court's decision in *Kushner,* but the *Kushner* Court specifically cited *Discon* and declined to pass on the merits of that factually distinct case. *See Kushner,* 533 U.S. at 163, 121 S.Ct. 2087 (stating that "[w]e do not here consider the merits of these cases [including *Discon*], and note only their distinction from the instant case.").

pitals were separate corporate entities from Tenet. *See* DE–361, Ex. 8 (Dennis Dep.) pp. 14–15.[17] In addition to corporate distinctness, the testimony of both William Smith (a Tenet executive vice-president during the pertinent time frame) and Thomas Mackey (Tenet's chief operating officer during the years at issue) presents sufficient evidence that local hospital management controlled most of the operations at the Tenet-affiliated hospitals, including pricing. Generally speaking, Mackey testified that the individual hospitals had their own CEOs "who had a great deal of authority over all aspects of the operations of their hospital." DE–363, Ex. 6 (Mackey Dep.) p. 32. In particular, there is testimony that decisions on price increases were made at the local hospital level. When Smith was asked who authorized unbudgeted price increases,[18] he testified that "[t]he ... hospital CEO, CFO would make those decisions." Smith Dep. at 48; *see also* Smith Dep. at 33 (agreeing that "typically the individual hospitals determined what their rate increases need to be in order to accomplish what their financial commitments are," and remembering only one across-the-board increase that Tenet authored). On the other hand, there appears to be conflicting testimony suggesting that Tenet imposed charges on its affiliated hospitals, *see* Smith Dep. at 22 (discussing e-mail stating that no rate increases where to take effect without Tenet president's approval), and that "local control" was merely an argument to raise as a litigation strategy. *See id.* pp. 54–55. Although the evidence is conflicting, a jury armed with this testimony could reasonably conclude that Tenet and the affiliated hospitals were distinct—that is, free and independent and capable of acting adversely to one another, especially with respect to the critical question of pricing. Thus, summary judgment cannot be granted on this ground.

### F. Fact Questions Exist as to Whether Tenet was Involved in a RICO Conspiracy.

■■■ Tenet next argues that Boca's evidence is insufficient to establish the existence of a voluntary agreement between Tenet and the affiliated hospitals to take part in a pattern of unlawful racketeering activity. The *prima facie* case for a RICO conspiracy requires evidence that two or more persons knowingly joined in the scheme and directly or indirectly involved itself in the commission of at least two predicate offenses. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir.1994) (citations omitted); *see also United States v. Starrett*, 55 F.3d 1525, 1543–44 (11th Cir.1995). "To prove that an agreement exists between two or more persons, a plaintiff must demonstrate 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1455–56 (11th Cir.1991) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). Conspiracies are often proved with circumstantial evidence. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573–74 (11th Cir.1991) (citing *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir.1989); *see also Starrett*, 55 F.3d at 1544). Because it is rare that a party can produce direct evi-

---

**17.** There is, however, some contradictory evidence suggesting that the hospitals may have been organized through subsidiary corporations Tenet owned. *See* DE–363, Ex. 5 (Smith Dep.) p. 37 (stating that "the hospitals were, generally speaking, owned—owned by subsidiaries that were set up by—the company.").

**18.** As used by Tenet's employees, "unbudgeted" price increases appear to be those that were untied to any cost increases.

dence of an express agreement between parties to conduct an illegal activity, most conspiracies are inferred from the defendant's behavior. *Id.* at 1573–74.

Here, viewed in the light most favorable to Boca, there is sufficient probative evidence that Tenet and the affiliated hospitals agreed to drive their prices high in an effort to create excessive outlier payments. Setting aside the question of whether such conduct agreed to was illegal, and focusing only on whether there was agreement, a reasonable jury could conclude that there was such assent to rate increases for the purpose of obtaining more outliers, given the fact that the 76 Tenet hospitals all had CCRs that for at least some period fell below the LNT. Keeping in mind that the low National Threshold line represents hospital CCRs at least three standard deviations from the mean, the chances of all 76 Tenet-affiliated hospitals falling within this range without some shared strategy or agreement would appear to be very small. A jury could reasonably infer from this an agreement among the hospitals and Tenet. Of course, another plausible explanation is that Tenet directed the hospitals to act, which, of course, would undermine Boca's argument that the individual hospitals were distinct from Tenet. However, the election between these competing inferences should be left for the jury. Accordingly, summary judgment for Tenet on this ground must be denied.

### G. Material Factual Disputes Preclude Summary Judgment on Tenet's Advice of Counsel Defense.

Tenet also maintains it is entitled to summary judgment because its advice of counsel defense negates the intent element of the predicate theft. *See United States v. Johnson,* 730 F.2d 683, 686 (11th Cir. 1984) ("The defense of good faith reliance on expert advice is designed to refute the government's proof that the defendant in-

tended to commit the offense."); *United States v. Bennett,* 665 F.2d 16, 22 (2d Cir.1981) (violation of 18 U.S.C. §§ 2314–15 requires proof that defendant knowingly and willfully took property without consent). In order to prevail on an advice of counsel defense, Tenet must show that (1) it disclosed all material facts to counsel in seeking legal advice about its charging conduct and (2) that when it increased its charges to collect additional outliers it relied in good faith on counsel's advice that such conduct was lawful. *See United States v. Condon,* 132 F.3d 653, 656 (11th Cir.1998).

Tenet proffers facts establishing that it did solicit the advice of counsel at various times regarding the legitimacy of its price increases, and that different counsel on three occasions generally provided opinions declaring Tenet's price increases lawful. In June of 1999, Tenet's former in-house counsel, Christi Sulzbach, authored a legal opinion as to whether Tenet could impose a 15% charge increase in two of Tenet's three corporate divisions. *See* DE–336, Ex. 43 (June 8, 1999 Memo from C. Sulzbach to T. Mackey and T. Fetter). In concluding that the increase was not prohibited, Ms. Sulzbach determined that Medicare did not impose "any prohibition on the provider's ability to set charges at any level." *Id.* p. 2. This opinion, however, focuses only on a one-time 15% increase, not the higher cumulative increases involved here. In addition, her opinion does not analyze the impact of the SWA CCR, and it erroneously assumes that any short-term benefits of the price increase will be offset once the annual cost reports are audited. As such, Ms. Sulzbach's opinion cannot conclusively be read to condone the ongoing nature of the unbudgeted price increases Boca alleges.

Even less compelling is Tenet's reliance on a May 2000 opinion from Tenet's Assis-

tant General Counsel, Michael Appelhans, who concluded that "it is legal to enact rate increases." *Id.*, Ex. 42 (May 16, 2000 e-mail from M. Appelhans to K. Love). This opinion consists of only four short paragraphs contained in an e-mail, and it sets forth no actual analysis of the Medicare regulations. Nor does it even describe the scope of the rate increase in question. More importantly though, the opinion expresses certain fundamental misunderstandings about how Medicare outliers work that raise serious questions about whether all the pertinent facts at Tenet's disposal were shared with Appelhans. For instance, the opinion concludes that "implementation of the rate increases ... *actually results in a positive benefit for the federal and state government* ... since the rate increases are largely assumed by [commercial payers]". *Id.* (emphasis added).

Lastly, Tenet cites to the opinion of its outside counsel, Crowell & Moring ("C & M"). *Id.*, Ex. 40 (Nov. 21, 2002 memo from J. Brennan, Jr. to C. Sulzbach).[19] C & M's analysis represents a more thoughtful opinion than those authored by in-house counsel. The November memo demonstrates that Tenet requested an opinion regarding wholesale price increases without regard to actual costs. Nevertheless, for two reasons the C & M memo fails to satisfy Tenet's burden on the advice of counsel defense. First, Tenet could not have relied on C & M's advice for the three years prior to 2002, the year the memo issued. Second, there are issues with the nature of C & M's advice that raise questions about whether all of Tenet's conduct was legitimized by the opinion.

For instance, C & M states in its conclusion that "if the increased charges do yield a significantly out-of-line cost-to-charge ratio, federal regulations include controls which require that the individual hospital's cost-to-charge ratio be disregarded and that the Statewide cost-to-charge ratio be applied." Of course, it was the application of the SWA CCR to the most out-of-line hospitals that actually made them more, rather than less, profitable. Obviously, Tenet failed to disclose to C & M that the SW CCR operated to increase its outlier reimbursements. Without this information, it cannot be established conclusively that Tenet gave its counsel all the material facts in seeking the opinion from C & M. Thus, although Tenet is certainly free to present its advice of counsel defense to a jury in an effort to undermine Boca's evidence of intent, too many sufficiently disputed material facts preclude the entry of judgment in Tenet's favor based on advice of counsel.

### H. Unclean Hands

Tenet also seeks summary judgment on the affirmative defense of unclean hands. There is a legitimate dispute about whether the defense applies to RICO claims, but there is no need to resolve that issue here as Tenet has not established a sufficient basis for applying unclean hands to Boca. It is true that Boca, like many other hospitals, had some questionable charge-increasing practices which did have a concrete negative impact on the FLT. However, Tenet has not addressed where the line distinguishing between lawful and unlawful charging should be drawn. Tenet

---

**19.** C & M apparently sent a substantially similar draft version to Tenet in February of 2002. *See* DE–336, Ex. 44. C & M authored the opinion at the request of Tenet's former General Counsel, in order to determine "whether a participating hospital paid by Medicare pursuant to the prospective payment system ('PPS') is constrained from increasing its charges under federal law, particularly with regard to the 'cost outlier' regulations...." *Id.*, Ex. 40, p. 1. C & M concluded that except for "certain limited caveats" the outlier regulations impose "no such constraints." *Id.*

does not adopt Boca's argument that the low National Threshold line defines liability. If that were the case, Boca's hands would be clean because its CCRs never crossed the low National Threshold line. Tenet (perhaps for obvious reasons) has not offered any separate explanation for how to impose liability on Boca. Therefore, the Court cannot grant summary judgment on the defense of unclean hands.

## IV. Conclusion

Because there is insufficient evidence to establish that Tenet's overcharging directly led to Boca's injuries, and because Boca has no admissible evidence to establish the effect of Tenet's overcharging on the FLT, and ultimately on Boca's outlier receipts, summary judgment in Tenet's favor must be granted. Accordingly, it is hereby

ORDERED that

(1) Tenet's Motion for Summary Judgment [DE–326] is GRANTED. Judgment in Defendant's favor on Counts I and II of Plaintiff's Amended Complaint shall be entered in a separate concurrently issued order;

(2) Tenet's Motion to Strike Boca's Experts [DE–301] is GRANTED; Boca is excluded from presenting evidence of the Lewin Model to prove Tenet's impact on the FLT or Boca's resulting damages;

(3) Any other motions not previously ruled upon are DENIED AS MOOT; and this case is CLOSED.

DONE AND ORDERED.