**VIRIDIS CORPORATION,**
et al., Plaintiffs,

v.

**TCA GLOBAL CREDIT MASTER
FUND, LP, et al.,**
Defendants.

**Case No. 1:15–cv–61706–UU**

United States District Court,
S.D. Florida.

Signed December 17, 2015

Christina Guzman, Richard Wayne Epstein, Greenspoon Marder Law, Fort Lauderdale, FL, Jordan Kam, Richard A. Roth, The Roth Law Firm, PLLC, New York, NY, for Plaintiffs.

Carl Francis Schoeppl, Jr., Schoeppl & Burke, P.A., Boca Raton, FL, Jacqueline Marie Arango, Sandra Jessica Millor, Lawrence Dean Silverman, Akerman, Senterfitt, Miami, FL, for Defendants.

## ORDER

Ursula Ungaro, United States District Judge

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss the First Amended Complaint. D.E. 33.

THE COURT has considered the Motion, the pertinent portions of the record and is otherwise fully advised in the premises.

## BACKGROUND

The following facts are taken from Plaintiffs' First Amended Complaint. D.E. 24. On September 23, 2015, Plaintiffs, Viridis Corporation ("Viridis"), Beck–Ford Construction, LLC ("Beckford"), LCTI Low Carbon Technologies International, Inc. ("LCTI"), Ideal National Mechanical Corporation ("Ideal"), Commercial & Institutional Mechanical, Ltd. ("C & I"), Sustainable Energy Properties, Inc. ("SEP"), WK Management Services, Inc. ("WKMS"), and Bryan Scott Jarnagin ("Jarnagin") (collectively "Plaintiffs"), filed their First Amended Complaint against

Defendants, TCA Global Credit Master Fund, LP ("TCA"), Robert Press ("Press"), and Donna Silverman ("Silverman") (collectively "Defendants"), and asserted the following claims: (1) Violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) Violation of RICO, 18 U.S.C. § 1962(d); (3) Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.211 (2015); (4) Declaratory Judgment under Florida law; (5) Declaratory Judgment—Fee Note Constitutes Usurious Interest under Florida law; (6) Tortious Interference with Business Relationships under Florida law; (7) Civil Conspiracy under Florida law; (8) Concert of Action under Florida law; (9) Breach of Implied Covenant of Good Faith and Fair Dealing under Florida law; (10) Unjust Enrichment under Florida law; and (11) Accounting.[1]

Plaintiff Jarnagin is an entrepreneur and developer in the areas of commercial construction, technology, real estate, and energy efficiency industries. D.E. 24 ¶ 19. Plaintiff Viridis creates companies in the clean-tech, energy efficiency, environmental conservation, and green building sectors. Id. ¶ 20. Viridis's subsidiary, Plaintiff Beckford, is a commercial general contracting company that specializes in the design and construction of facilities. Id. ¶ 21. Plaintiff LCTI is a technology company that focuses on securing, licensing, and deploying green technologies. Id. ¶ 22. LCTI's subsidiaries, Ideal and C & I, provide mechanical contracting services. Id. ¶ 23–24. Another LCTI subsidiary, SEP, is involved with promoting innovative clean solutions for applications within the infrastructure and energy sectors. Id. ¶ 25. Plaintiff WKMS is an indirect subsidiary of SEP

---

1. On December 2, 2015, Plaintiffs filed their Notice of Voluntary Dismissal of Count XI (Only) and dismissed their Accounting (Count XI) claim. D.E. 64.

and LCTI. *Id.* ¶ 26. Defendant TCA was created to support the trading and investing activities of two feeder funds: (i) TCA Global Credit Fund, Ltd. and (ii) TCA Global Credit Fund. *Id.* ¶ 27. These feeder funds invest all of their assets in TCA. *Id.* ¶ 27. Defendant Press is the Chief Executive Officer and Founding Partner of TCA. *Id.* ¶ 17. Defendant Silverman is the Managing Director of TCA. *Id.* ¶ 18.

In 2013, Jarnagin was searching for financing for three potential acquisitions, which he estimated would require approximately $10 million in funding. *Id.* ¶ 36. Two financing headhunters connected Jarnagin with Press and Silverman, both of TCA, who proposed providing Jarnagin with a $20 million revolving credit line. *Id.* ¶ 39. During a conversation between Jarnagin and Press and Silverman on October 19, 2013, which occurred via telephone and e-mail, Press and Silverman did not inform Jarnagin that TCA could not fund a $20 million credit line because TCA's corporate charter prohibited TCA from making a single loan greater than 2% of TCA's total Net Asset Value. *Id.* ¶ 40. In addition to the $20 million credit line, TCA's proposal also included fees, costs, and assessments. *Id.* ¶ 41. Jarnagin declined the proposal amount because it exceeded his needs for future acquisitions. *Id.* ¶ 42. Press and Silverman then proposed a $10 million line of credit, which Jarnagin accepted. *Id.* ¶ 43. LCTI, C & I, SEP, and WKMS ("Plaintiff borrowers") executed a Credit Agreement evidencing the $10 million line of credit on November 19, 2013. *Id.* ¶ 44; D.E. 24–1.

On November 19, 2015, the Plaintiff borrowers also executed a Revolving Note in the amount of $2,250,000.00 to fund the acquisition of Ideal for approximately $1.5 million. *Id.* ¶ 45; D.E. 24–2. In connection with this closing, Plaintiffs paid approximately $187,350.00 to TCA in closing costs. *Id.* ¶ 46. LCTI, C & I, SEP, and WKMS also executed security agreements, placing a first priority security interest on personal property. *Id.* ¶ 49. WKMS provided a Deed of Trust that mortgaged real property in Texas. *Id.* Jarnagin delivered a personal guaranty to TCA in the form of a Validity Certification, where he personally guaranteed payment of the full amount of the original loan. *Id.*; D.E. 24–3. Under the terms of the Agreement, the Plaintiff borrowers were required to send payments and receipts to a TCA-controlled post office box and to deposit the payments and receipts into a TCA-controlled bank account, called a Lock Box Account. *Id.* ¶ 51. LCTI, C & I, SEP, and WKMS executed a Lock Box Deposit Requirement Confirmation, which required all receipts, monies, checks, notes, drafts, or other payments to be deposited into a designated account, or mailed to a post office box in Atlanta, Georgia. *Id.* ¶ 52. The Lock Box Account was subject to automatic withdrawals by TCA of the principal and interest due under the terms of the original loan. *Id.* ¶ 53. The loan required that the borrowers maintain at least 20 percent of the revolving loan commitment in the Lock Box Account, and if the amount of $450,000.00 was not maintained in the account, TCA was entitled to withhold and apply an equal amount to establish the minimum. *Id.* Under the terms of the agreement, the borrowers were also required to pay an "advisory fee" to TCA in the amount of $250,000.00, and LCTI issued 2,500,000 restricted shares of its common stock to TCA pursuant to the agreement. *Id.* ¶ 57, 59.

Following the closing of this loan, Press and Silverman promised Jarnagin that funding for the next two acquisitions would follow 30 to 45 days after the Ideal acquisition. *Id.* ¶ 60. Jarnagin submitted a request to fund the second acquisition for $3.2 million, but TCA refused to fund it

and the second acquisition failed. *Id.* ¶ 61. Jarnagin submitted a request to TCA to fund a third acquisition and purchase Beckford for $3.8 million, but TCA refused to do so. *Id.* ¶ 62. In a telephone conversation, Silverman informed Jarnagin that despite TCA's commitment to a loan of $10 million, it could not do so because it would push TCA over its lending limit of 2 percent of its corporate charter. *Id.* ¶ 63. Jarnagin asked Silverman why TCA offered a loan for $10 million if a $3.8 million transaction would exceed TCA's lending limits and violate its corporate charter, but Silverman did not have an answer for Jarnagin. *Id.* ¶ 64–65.

Beginning in March 2014, TCA refused to allow Jarnagin to make withdrawals from the Lock Box Account and held sums of Plaintiffs' money in excess of the amounts that were due to TCA under the repayment terms of the loan. *Id.* ¶ 67. Because TCA constricted Plaintiffs' cash through the Lock Box Account, Ideal and C & I were unable to meet payroll, to pay payroll taxes, and to pay their subcontractors and vendors. *Id.* ¶ 68. Because of this, Plaintiffs' bonding company pulled bonding lines, the vendors cut off all lines of credit, and their customers stopped issuing new contracts. *Id.* ¶ 68. Ideal lost more than $25 million in contracts as a result of TCA's tactics. *Id.* Press and Silverman refused to make additional funds available on the existing credit line, but proposed a new transaction. *Id.* ¶ 69. Jarnagin agreed. *Id.* ¶ 70.

In May 2014, the Plaintiff borrowers executed a First Amendment to Credit Agreement and First Replacement Revolving Note in the amount of $3,135,439.58. D.E. 24–5; D.E. 24–6. The borrowers paid $471,500.00 in closing costs. *Id.* ¶ 74. In August 2014, Jarnagin informed TCA that he intended to pay off the outstanding balance by refinancing with another lender. *Id.* ¶ 80. Silverman avoided telephone calls from the other lender, but she eventually agreed to participate in a telephone call on September 2, 2015. *Id.* ¶ 82. Thereafter, Silverman issued a default letter and informed the other lender, via telephone and e-mail, that Plaintiffs were in default for their failure to deposit money in the Lock Box Account and for their failure to adhere to the Credit Agreement's reporting requirements. *Id.* ¶ 83; D.E. 24–8.

In October 2014, the Plaintiff borrowers executed a Second Amendment to Credit Agreement and a Second Replacement Revolving Note in the amount of $3,768,563.04 with TCA. *Id.* ¶ 89; D.E. 24–9, 24–10. In connection with this document, Plaintiffs paid $33,250.00 in closing costs to TCA. After the Second Amendment closed, Press and Silverman agreed to fund the Beckford acquisition, and offered the Plaintiff borrowers a second $10 million revolving loan of credit. *Id.* ¶ 93–94.

On October 31, 2015, Viridis and TCA entered into a Senior Secured Revolving Credit Facility Agreement, which became effective on December 31, 2014, where TCA agreed to extend a $10 million revolving line of credit to allow Viridis to acquire Beckford. *Id.* ¶ 95. Pursuant to this Agreement, Beckford would become a guarantor of the Viridis/Beckford Agreement. *Id.* TCA required Viridis to execute a Revolving Note in the amount of $4.1 million for the acquisition of Beckford. *Id.* ¶ 96. As security for the Agreement, TCA required Viridis to execute a Security Agreement, required Beckford to execute a Corporate Guaranty and Security Agreement, and required Jarnagin to execute a Personal Guaranty, Pledge and Escrow Agreement, and Validity Certificate. *Id.* ¶ 97. TCA required that LCTI execute a "fee note" in the amount of $4.1 million.

*Id.* ¶ 101. On October 31, 2014, LCTI, as borrower, and C & I, Ideal, SEP, and WKMS, as guarantors, executed a Repayment Agreement. *Id.* ¶ 102. The Agreement obligated LCTI to pay TCA $4.1 million for "advisory services" and for "investment banking services" that were provided by TCA prior to the date of the repayment agreement. *Id.* In connection with this loan, Plaintiffs paid $152,550.00 in closing costs to TCA. *Id.* ¶ 107. Pursuant to the Second Amendment, the provision relating to the Lock Box Account allowed TCA to retain a hold back of approximately 5 percent from all checks deposited into the Lock Box Account, which would be applied to indebtedness repayment. *Id.* ¶ 115. TCA then demanded that the hold back be increased from 30 to 50 percent. *Id.*

Following this, Jarnagin attempted to secure lending from an outside lender to refinance the amount that Plaintiffs owed to TCA. *Id.* ¶ 116. In April 2015, Jarnagin informed Silverman that Viridis was in negotiations with another lender to pay off the debt owed to TCA and asked TCA to provide a written statement of the payoff amount. *Id.* ¶ 117. Silverman informed Jarnagin that Viridis was in default for their failure in making monthly payments. *Id.* ¶ 118. On the telephone, Silverman told Jarnagin that she and another TCA employee had consulted with Press, and that TCA would only agree to lift the default if Jarnagin agreed to sign an audit statement establishing that Viridis and Beckford were not only liable for the obligations under the terms of the Agreement, but were also liable for the 100% interest charge imposed by the $4.1 million fee note. *Id.* ¶ 119. Jarnagin refused to sign the audit statement. *Id.* ¶ 120. TCA then sent Viridis and LCTI a formal notice of default, dated May 1, 2015, alleging the failure to pay under the LCTI Repayment Agreement, which triggered the cross-de-fault and cross-collateralization provisions of the agreements. *Id.* ¶ 121. The issuance of the May 1, 2015 notice of default ended Jarnagin's discussions with the outside lender. *Id.* ¶ 122.

On August 12, 2015, Press and Silverman proposed a global amendment to the foregoing loans with an Amendment to Credit Agreements. *Id.* ¶ 123. The Amendment to Credit Agreements provided that if the Viridis/Beckford Note and the Second Replacement Revolving Note were paid off, TCA would release the collateral pledged by Viridis, Beckford, and WKMS under the Viridis/Beckford Agreement. *Id.* ¶ 123. All of the corporate and personal guaranties and asset pledges exacted under the LCTI Repayment Agreement, however, would remain in force to secure the payment of a new Fee Note. *Id.*

Plaintiffs claim that Defendants' predatory lending practices, as alleged, have caused damages consisting of the following: (1) Plaintiff Ideal lost $25 million in customer contracts and more than $6 million in corresponding profits; (2) Plaintiff LCTI is wrongfully being held responsible to TCA for $4.1 million for "advisory services" and "investment banking services" that were never rendered; (3) Plaintiffs C & I, Ideal, SEP, and WKMS are liable to TCA as guarantors of Plaintiff LCTI's $4.1 million debt for "advisory services" and "investment banking services" that were never rendered; (4) Plaintiffs have been required to allow TCA to lien their assets, thereby preventing refinancing with third-party lenders; (5) Plaintiffs Ideal and C & I were deprived of their operating funds and have incurred attorneys' fees and costs in defending litigation brought by other creditors; and (6) Plaintiffs have suffered injury to their goodwill and business reputations. *Id.* ¶ 141(a)-(d), 142(a)-(f).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court has stated that a plaintiff must submit "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In considering a motion to dismiss for failure to state a cause of action, the "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir.2014) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement

to relief.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955)). Although "[a] plaintiff need not plead 'detailed factual allegations[,] ... a formulaic recitation of the elements of a cause of action will not do,'" and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" *Simpson*, 744 F.3d at 708 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955)).

## ANALYSIS

In their Motion to Dismiss, Defendants argue that each of the claims fails and should be dismissed. Specifically, Defendants argue that Plaintiffs released and waived any right to bring this action pursuant to the terms of the loan agreements with TCA, and therefore, this action should be dismissed with prejudice.[2] With respect to Plaintiffs' civil RICO claims (Counts I and II), Defendants argue that these claims must be dismissed because: (1) Press and Silverman cannot be liable for activities that occurred within their corporate capacities; (2) Plaintiffs failed to plead the predicate acts with the requisite specificity; (3) the conduct alleged by Plaintiffs does not rise to the level of a

---

**2.** Defendants argue that Plaintiffs' Amended Complaint should be dismissed with prejudice because Plaintiffs released and waived their claims against Defendants in the provisions contained within the pertinent loan documents at issue. D.E. 33. Defendants concede that a general release is an affirmative defense; however, Defendants insist that it is proper for the Court to consider the release as a bar to this action based upon the face of the exhibits to the complaint. In opposition, Plaintiffs argue that any "releases" are unenforceable because: (1) Defendants "may not contractually thwart liability for [their] own fraud," *Burton v. Linotype Co.*, 556 So.2d 1126, 1127 (Fla. 3d DCA 1989), and (2) the releases are unenforceable as they were procured by means of economic duress.

While the Court is cognizant that a general release is an affirmative defense that may be "properly raised ... by way of motion to dismiss because the existence of the defense may be judged on the face of an exhibit which is attached to the plaintiff's complaint and made central to its claims," the Court refuses to find the general release bars Plaintiffs' claims at this time. *See Brooklands, Inc. v. Sweeney*, No. 14–81298–CIV, 2015 WL 1930239, at *3 (S.D.Fla. Apr. 28, 2015). In light of the factual allegations contained within Plaintiffs' Amended Complaint, the Court finds that additional discovery is needed on this issue, and as such, the general release will be considered as an affirmative defense at trial, assuming Plaintiffs are able to state a claim under the RICO statutes.

RICO "pattern" that amounts to or poses a threat of "continued" criminal activity; (4) Plaintiffs have not adequately pled proximate cause or damages; and (5) Plaintiffs failed to plead a civil RICO conspiracy. Defendants' remaining arguments pertain to a variety of state law claims (Counts III–X).[3] The Court considers each argument directed towards Plaintiffs' civil RICO claims in turn.

### Federal Civil RICO Standard

■ Pursuant to 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise in, or the activities of such affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, "in order to establish a federal civil RICO violation under § 1962(c), the plaintiffs 'must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Williams v. Mohawk Indust., Inc.,* 465 F.3d 1277, 1282 (11th Cir.2006) (citing *Jones v. Childers,* 18 F.3d 899, 910 (11th Cir.1994)). Section 1962(d) of the RICO statutes provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

■ Furthermore, in civil cases, RICO plaintiffs must meet the requirements of 18 U.S.C. § 1964(c). *See Williams,* 465 F.3d at 1282–83. Section 1964(c) states that "[a]ny person injured in his business

or property by reason of" RICO's substantive provisions has the right to "recover threefold the damages he sustains[.]" 18 U.S.C. § 1962(c). Thus, under § 1964(c), civil RICO claimants "must show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Williams,* 465 F.3d at 1283.

### 1. Pleading Proximate Cause and Damages for RICO Claim

■ The Eleventh Circuit Court of Appeals has stated, "[t]he test for RICO standing is whether the alleged injury was directly caused by the RICO violation, not whether such harm was reasonably foreseeable." *Williams v. Mohawk Indus., Inc.,* 465 F.3d 1277, 1291 (11th Cir.2006) (citing *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.,* 140 F.3d 898, 908 (11th Cir.1998)); *Sedima v. S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("The plaintiff only has standing if, and can only recover to the extent, that he has been injured in his business or property by the conduct constituting the violation" and the plaintiff's damages must "flow from the commission of the predicate acts."); *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1307 (11th Cir.2003) (stating that plaintiffs must show a "direct relation between the injury asserted and the injurious conduct" and that a court asks "whether the alleged conduct was 'aimed primarily' at a third party"); *Bivens,* 140 F.3d at 906 (concluding that a

---

**3.** Because the Court finds Plaintiffs failed to state a claim under 18 U.S.C. § 1962(c) and (d), the Court will not address Defendants' arguments pertaining to Plaintiffs' state law claims at this time. The Eleventh Circuit Court of Appeals "has noted that 'if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismiss-

al of state claims.'" *Handi–Van Inc. v. Broward Cnty.,* 445 Fed.Appx. 165, 170 (11th Cir.2011) (quoting *Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir.1999)). In keeping with the Eleventh Circuit's principles, the Court must also dismiss Plaintiffs' state law claims, over which this Court would only retain supplemental jurisdiction.

party whose alleged injuries result from "the misfortunates visited upon a third party by the defendant's acts lacks standing to pursue a claim under RICO"); *Pelletier v. Zweifel*, 921 F.2d 1465, 1497 (11th Cir.1991) (stating that the plaintiff has RICO standing if he shows "a causal connection between his injury and a predicate act").

■■■ For federal RICO purposes, courts evaluate proximate cause "in light of its common-law foundations." *Corcel Corp., Inc. v. Ferguson Enters., Inc.*, 551 Fed.Appx. 571, 576 (11th Cir.2014) (citing *Hemi Grp. LLC v. City of New York, N.Y.*, 559 U.S. 1, 9, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010)). In considering whether a plaintiff has sufficiently pleaded proximate cause, "the central question that it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). Thus, proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 464, 126 S.Ct. 1991 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532· (1992)). A link that is "too remote," "purely contingent," or "indirect" is insufficient. *Id.* at 457, 126 S.Ct. 1991. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 444 Fed.Appx. 401, 410 (11th Cir.2011) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006)). In *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. at 268, 112 S.Ct. 1311, the Supreme Court discussed three specific factors for courts to consider in evaluating the directness between an alleged injury and the injurious conduct as follows:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from the problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

503 U.S. at 269–70, 112 S.Ct. 1311.

■■■ In evaluating whether proximate causation exists, a court should also consider the " 'motivating principles' behind the directness component of the proximate-cause standard in RICO cases." *Williams v. Mohawk Indust., Inc.*, 465 F.3d 1277, 1281 (11th Cir.2006) (citing *Anza*, 547 U.S. at 458, 126 S.Ct. 1991). Motivating principles include: (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action"; (2) "the speculative nature of the proceedings that would follow if [the plaintiff] were permitted to maintain its claims"; (3) whether the alleged harm "could have resulted from factors other than [the plaintiff's] alleged acts of fraud"; (4) "any appreciable risk of duplicative recoveries; and (5) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own

claims." *Corcel Corp., Inc. v. Ferguson Enters., Inc.*, 551 Fed.Appx. 571, 576 (11th Cir.2014) (citing *Anza*, 547 U.S. at 458–460, 126 S.Ct. 1991)). "The less direct an injury is, the more difficult it becomes to ascertain the amount of plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Corcel*, 551 Fed.Appx. at 576 (citing *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311).

Defendants insist that Plaintiffs have not alleged any injury to their business or property that was directly and proximately caused by Press or Silverman. D.E. 33. Defendants argue that Plaintiffs "failed to connect the dots between the alleged wire/mail fraudulent acts and how Plaintiffs relied on those acts, proximately causing these purported injuries to Plaintiffs." *Id.* Defendants contend that "Plaintiffs have failed to identify the specific legal actions brought against Ideal and C & I, or explain how TCA's loaning Plaintiffs' monies directly or proximately caused Ideal and C & I to fail to pay others, and how Press and Silverman are liable for this." *Id.* In opposition, Plaintiffs argue that they alleged "[b]ut for Press and Silverman's fraudulent inducement of the loan documents ... Jarnagin would never have executed documents granting TCA those valuable rights." D.E. 50.

■ Plaintiffs allege that Defendants' activities out of TCA's Florida office have caused, among other effects:

a. Ideal ... to lose more than $25 million in customer contracts and more than $6 million in corresponding profits;

b. LCTI ... to purportedly owe $4.1 million to TCA for purported "advisory services" and "investment banking services" that were never rendered; and

c. C & I ... Ideal, SEP, and WKMS ... to guarantee LCTI's $4.1 million payment to TCA for purported "advisory services" and "investment bank services" that were never rendered; and

d. TCA's wrongfully acquired first priority security interests in certain of Plaintiffs assets are currently making it impossible for Plaintiff companies to obtain money from third-party lenders in order to satisfy any debt to TCA.

D.E. 24 ¶ 141(a)-(d). In addition, Plaintiffs allege that:

a. Plaintiff Ideal has suffered damages in an amount to be proven at trial, but currently believed to be at least $6,248,314.80, which constitutes a conservative estimate of Ideal's lost profits on four specific contracts that Ideal did not receive as a direct and proximate result of Press and Silverman's wrongful manipulation of the Lock Box Account for the purpose of collecting an unlawful debt in violation of 18 U.S.C. § 1962(c);

b. Plaintiff Ideal has suffered damages, in an amount to be proven at trial, consisting of costs and attorneys' fees incurred in connection with three separate legal proceedings brought against Ideal to collect sums due and owing that Ideal was not able to timely pay due to Press and Silverman's wrongful manipulation of the Lock Box Account for the purpose of collecting an unlawful debt in violation of 18 U.S.C. § 1962(c);

c. Plaintiff C & I has suffered damages, in an amount to be proven at trial, consisting of costs and attorneys' fees incurred in connection with defending a lawsuit brought against C & I to collect sums due and owing that C & I was not able to timely pay due to

Press and Silverman's wrongful manipulation of the Lock Box Account for the purpose of collecting an unlawful debt in violation of 18 U.S.C. § 1962(c);

d. Defendants Press and Silverman's violations of § 1962(c) have damaged the business reputation and/or customer goodwill of each Plaintiff, in an amount to be proven at trial.

e. All Plaintiffs have incurred costs and attorneys' fees in connection with bringing and prosecuting the instant lawsuit.

f. As to the actions of Defendants Press and Silverman were intentional and designed to deceive the Plaintiffs, Plaintiffs respectfully request an additional award of punitive damages.

D.E. 24 ¶ 142(a)-(f).

The Court finds Plaintiffs have failed to sufficiently plead that each has standing to bring this action. In this case, there are eight Plaintiffs: (1) Viridis, (2) Beckford, (3) LCTI, (4) Ideal, (5) C & I, (6) SEP, (7) WKMS, and (8) Jarnagin. D.E. 24 ¶¶ 8–15. In reviewing the First Amended Complaint, and specifically, Plaintiffs' Prayer for Relief (D.E. 24 ¶ 141(a)-(d), 142(a)-(f)), it is difficult for this Court to ascertain the damages that were sustained by each individual Plaintiff. Aside from conclusory allegations that Plaintiffs have incurred costs and attorneys' fees (*Id.* ¶ 141(e)) and have had their business reputation and/or customer goodwill injured (*Id.* ¶ 141(f)), there are no allegations that Plaintiffs Jarnagin, Viridis, Beckford, LCTI, SEP, and WKMS have suffered any damages as a direct result of Defendants' conduct. In addition, while Plaintiffs allege in their Prayer for Relief that Plaintiff C & I has suffered damages in connection with defending lawsuits brought by other creditors, there are no factual allegations supporting this conclusion within the First

Amended Complaint itself. Thus, the Court is not satisfied that Plaintiffs have sufficiently alleged that Plaintiffs Jarnagin, Viridis, Beckford, LCTI, SEP, and WKMS have standing to proceed in this action.

 Because of the intertwined nature of the standing, proximate cause, and damages analyses under the RICO statutes, the Court also finds that Plaintiffs have failed to allege proximate cause and damages. In their Motion, Defendants argue, "Plaintiffs have failed to connect the dots between the alleged wire/mail fraudulent acts and how Plaintiffs relied on those acts, proximately causing these purported injuries to Plaintiffs." The Court agrees and finds that Plaintiffs' allegations of injury and damage are conclusory and insufficient to allege that Defendants' conduct *directly* caused Plaintiffs' damages. By way of example, Plaintiffs allege that TCA's illegal activities began when Press and Silverman "induced Plaintiffs to execute loan documents (and thus give up extremely valuable rights to control their own assets) by misrepresenting that TCA" could extend lines of credit to fund acquisitions when Press and Silverman were aware that TCA could not do so based upon the limitations within TCA's corporate charter. D.E. 50. According to Plaintiffs, the purpose of the $10 million line of credit was for the acquisition of Ideal (D.E. 24 ¶ 43), and that, as a result of Plaintiffs' acceptance of the credit line under fraudulent pretenses, Ideal suffered damages. But, at the time Press and Silverman proposed the $10 million line of credit to Jarnagin, Ideal had not yet been acquired. Accepting Plaintiffs' allegations as true for purposes of this Motion, Ideal could not have standing to bring this RICO action because its damages could not flow *directly* from Press and Silverman's conduct. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct.

**1358**

1991, 164 L.Ed.2d 720 (2006) ("[T]he central question that it must ask is whether the alleged violation led directly to the plaintiff's injuries."). In other words, the relationship between the alleged wrongdoing and Ideal is not direct, but attenuated, at best.

The Court is also persuaded that "Plaintiffs have failed to identify the specific legal actions brought against Ideal and C & I, or explain how TCA's loaning Plaintiffs' monies directly and proximately caused Ideal and C & I to fail to pay others, and how Press and Silverman are liable for this." In responding to Defendants' Motion, Plaintiffs, once again, attempt to splice together a variety of paragraphs within their First Amended Complaint to establish proximate cause. In responding to Defendants' Motion, Plaintiffs continue to rely upon Defendants' taking hold of their "working capital," but in their First Amended Complaint, Plaintiffs do not clearly and specifically identify what the "working capital" is, which is crucial for purposes of establishing proximate cause in this case. In reading Plaintiffs' First Amended Complaint as it stands, the Court finds Plaintiffs have failed to establish proximate causation.

2. *Press and Silverman's Liability under 18 U.S.C. § 1962(c)*

To prevail on a claim under section 1962(c), "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Ray v. Spirit Airlines, Inc.*, No. 12–61528–CIV–Scola, 126 F.Supp.3d 1332, 1340, 2015 WL 5168367, at *5 (S.D.Fla. July 24, 2015) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)). An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). For purposes of establishing a valid enterprise to impose RICO liability, a plaintiff must prove that each party to the enterprise is separate and distinct from the other. *See Cedric*, 533 U.S. at 161, 121 S.Ct. 2087 (to establish liability under 1962(c), a plaintiff must prove the existence of two different entities, a "person" and an "enterprise" that is not simply the same "person" referred to by a different name).

The RICO statutes requires "[e]ach RICO defendant [to] be separate and distinct from the enterprise because liability 'depends on showing that the defendants conducted or participated in the conduct of the *'enterprise'*'s affairs,' not just their *own* affairs.'" *Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F.Supp.2d 1356, 1378 (S.D.Fla.2010) (citing *Cedric Kushner*, 533 U.S. at 163, 121 S.Ct. 2087)). As the Southern District of Florida has previously explained:

> Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, whether employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.

*Kelly*, 681 F.Supp.2d at 1378 (citing *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F.Supp.2d 1239, 1261 (S.D.Fla.2004)) (holding that the distinctiveness requirement was not met where an alleged "enterprise" consisted of corpo-

ration, employees, outside counsel, and agents and consultants); *see also Acosta v. Campbell*, No. 6:04cv761ORL28DAB, 2006 WL 146208, at *6 (M.D.Fla. Jan. 18, 2006) (law office and mortgage holders that engaged in debt collection activities following foreclosure on plaintiff's mortgage were not separate and distinct entities for purposes of RICO liability). The requirement for "separate and distinct" defendants "reflects Congress' intention in § 1962(c) to target a specific variety of criminal activity, 'the exploitation and appropriation of legitimate businesses by corrupt individuals.' " *United States v. Goldin Indus.*, 219 F.3d 1268, 1271 (2000) (quoting *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union, 639*, 883 F.2d 132, 139 (D.C.Cir.1989)).

▮ "While the law clearly prohibits RICO liability where the person and the enterprise are alleged to be one and the same, the law is equally well-settled that a defendant can be both a person under RICO and also part of the RICO enterprise." *Boca Raton Comm. Hosp., Inc. v. Tenet Healthcare Corp.*, 502 F.Supp.2d 1237, 1253 (S.D.Fla.2007) (citing *Kushner*, 533 U.S. at 163, 121 S.Ct. 2087)) (CEO and sole shareholder could be RICO person and also part of RICO enterprise consisting of himself and the company); *see also Goldin*, 219 F.3d at 1275 ("[A] defendant can clearly be a person under [the RICO] statute and also be *part* of the enterprise. The prohibition against the unit of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise.").

In their Motion, Defendants argue that Press and Silverman should be dismissed as individual Defendants because Plaintiffs' factual allegations pertain only to Press and Silverman in their capacities as corporate officers within the TCA enter-

prise, and not to actions undertaken by them in their individual capacities. D.E. 33. Therefore, Defendants argue, Plaintiffs fail to establish that for purposes of section 1962(c) liability, the "persons" are separate and distinct from the "enterprise" for purposes of section 1962(c) liability. In opposition, Plaintiffs rely upon the Supreme Court's opinion in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001), arguing that an individual may be deemed to be both a "person" that is separate and distinct from the "enterprise" for RICO liability, even though the individual is alleged to have acted within the scope of his employment.

In Plaintiffs' First Amended Complaint, Plaintiffs allege that "Defendant TCA is an 'enterprise' within the meaning of that term as it is used in 18 U.S.C. § 1962(c)." D.E. 24 ¶ 135. Plaintiffs allege that "Defendants Press and Silverman are members of the TCA Enterprise and are the liable 'persons' under 18 U.S.C. § 1962(c)." *Id.* ¶ 136. Furthermore, Plaintiffs define the "TCA Enterprise" as "a passive instrument used by its members, Defendants Press and Silverman, to perpetrate the TCA Enterprise's racketeering activity and to collect unlawful debt and usurious interest." *Id.* ¶ 137. Plaintiffs allege that Defendants Press and Silverman "conducted or participated, directly or indirectly, in the conduct of the TCA Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c)," which included eight predicate acts that are alleged in paragraphs 138(a)-(d) and 139(a)-(d).

▮ In this Circuit, it is a well-established principle of law that "[e]ach RICO defendant must be separate and distinct from the enterprise." *Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F.Supp.2d 1356, 1378 (S.D.Fla.2010). Generally

speaking, "where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F.Supp.2d 1239, 1261 (S.D.Fla. 2004). In other words, the mere fact that employees within a corporation conspire together to commit criminal acts within the scope of their employment does not, in and of itself, create a valid enterprise for purposes of RICO liability.

In the Supreme Court's opinion in *Cedric*, however, the Court found that the president and the sole shareholder of a corporation was a "person," as defined under 18 U.S.C. § 1962(c), who was legally separate and distinct from the corporation "enterprise." 533 U.S. at 158, 121 S.Ct. 2087. In arriving at its holding, the Court drew a distinction between cases where a corporate employee is alleged to be the "person" and the corporation is the "enterprise," and those cases where a corporation was a "person" and the corporation, together with all its employees and agents, is the "enterprise." *Id.* at 165, 121 S.Ct. 2087. The Court stated that failing to acknowledge this crucial distinction "would immunize from RICO liability many of those at whom this Court has said RICO directly aims—e.g., high-ranking individuals in an illegitimate criminal enterprise, who, seeking to further the purposes of that enterprise, act within the scope of their authority." *Id.*

In this case, the Court takes note of Defendants' argument that Plaintiffs' allegations of the conduct and acts undertaken by Defendants are alleged to have occurred solely within the scope of their employment by TCA. Defendants seem to suggest that because TCA is defined as the "enterprise," Press and Silverman are insulated from liability simply because they did not act outside the scope of their employment with TCA. The Supreme Court rejected this argument in *Cedric* when it reasoned that "[a] corporate employee who conducts the corporation's affair through an unlawful RICO 'pattern ... of activity', § 1962(c), uses that corporation as a 'vehicle' whether he is, or is not, its sole owner." 533 U.S. at 164, 121 S.Ct. 2087. Based upon this Court's reading of *Cedric*, if properly pleaded, Press and Silverman may be held liable for RICO violations and may be deemed to be "persons" who are separate and distinct from the "enterprise," contrary to Defendants' interpretation of *Cedric*.

Despite this reasoning, the Court takes issue with the manner in which Plaintiffs have pleaded their allegations. It is clear that TCA is defined as the "enterprise" within the meaning of this term as used in section 1962(c). D.E. 24 ¶ 135. Plaintiffs' allegations become murky, at best, however, when they define Press and Silverman as "members of the TCA Enterprise" *and* as the "liable persons" under this section. *Id.* ¶ 136. Under *Cedric*, it would be permissible for Plaintiffs to allege Press and Silverman as the "liable persons," with TCA alleged to be the "enterprise," but as the Amended Complaint reads, that is not what Plaintiffs have alleged. Once Plaintiffs commingle the roles of Press and Silverman as both "persons" and as "members of the enterprise" in their allegations, the Court finds that Plaintiffs fail to meet the separate and distinctiveness requirement that must be established to impose RICO liability upon Press and Silverman in their individual capacities.

### 3. Pleading Mail/Wire Fraud with Requisite Specificity

To establish liability under 18 U.S.C.1962(c), a plaintiff must plead a de-

fendant "committed a pattern of RICO predicate acts." *Simpson, v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014); *see also Levitan v. Patti*, No. 3:09cv321/MCR/MD, 2011 WL 1299947, at *9 (N.D.Fla. Feb. 8, 2011). The predicate acts must also be related to each other, meaning the acts must have the same or similar purposes, results, participants, victims, or methods of commission. *Design Pallets, Inc. v. GrayRobinson, P.A.*, 515 F.Supp.2d 1246, 1256 (M.D.Fla.2007). The predicate acts must also be continuous, which may be shown by a series of related acts committed over a substantial period of time. *Id.* More specifically, a plaintiff must show "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir.2004).

■ Where a plaintiff's section 1962(c) claim is premised on a pattern of racketeering that consists of the predicate acts of mail and wire fraud, "the substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal*, but also with Fed. R.Civ.P. 9(b)'s heightened pleading standard, which requires that 'in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Amer. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir.2010) (citing *Ambrosia Coal & Constr.*

*Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir.2007)) (holding that civil RICO claims, which are "essentially a certain breed of fraud claims, must be pleaded with an increased level of specificity under Rule 9(b)"); *see also Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1511–12 (11th Cir.1988) (finding the Rule 9(b) pleading requirement is applicable to RICO claims predicated on wire and/or mail fraud).

■ Furthermore, the Eleventh Circuit Court of Appeals has held that pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir.1997). In addition, the plaintiff must allege particular facts with respect to each individual defendant's participation in the fraud. *Id.* In other words, a plaintiff is required to set forth specific allegations as to each defendant that will fulfill the "who, what, when, where and how" pertaining to the underlying fraud. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir.2006).

Defendants contend that because Plaintiffs are basing their RICO claims on mail and wire fraud,[4] Plaintiffs are required to

---

4. In their Response, Plaintiffs argue that even if their predicate acts of mail and/or wire fraud claim fail, they have adequately pleaded predicate acts of the "collection of an unlawful debt." Section 1961(b) defines "unlawful debt" as a debt "incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole

or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or in the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(b). Despite this definition,

meet the heightened pleading requirements under Federal Rule of Civil Procedure 9(b). D.E. 33. Specifically, Defendants argue that Plaintiffs failed to plead the purported predicate acts attributable to Press and Silverman with the requisite specificity and failed to allege a false representation or element of fraud within those representations. *Id.* Plaintiffs argue that the allegations of multiple and specific acts of mail or wire fraud committed by Press and Silverman "easily" satisfy the pleading standards established by Federal Rules of Civil Procedure 8 and 9(b), and Plaintiffs allege no fewer than eight specific acts of fraud, all within a two-year period. D.E. 50.

▮▮▮ First, Defendants argue that Plaintiffs failed to meet the heightened pleading standard required for pleading the predicate acts of mail/wire fraud because Plaintiffs improperly lumped Silverman and Press together in their RICO claim and failed to plead the purported predicate acts attributable to Press and Silverman with the requisite specificity. The Court agrees. Based upon Plaintiffs' allegations within paragraph 138 of Plaintiffs' First Amended Complaint, it is clear that the acts and conduct of both Press and Silverman are lumped together with no distinction. *See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F.Supp.2d 1355, 1363 (M.D.Fla.2007) ("When the complaint asserts claims against multiple defendants, it cannot merely 'lump together all of the defendants in their allegations of fraud. Rather it must contain 'specific allegations with respect to each defendant that are sufficient to inform each defendant of the na-

ture of his alleged participation in the fraud.' "). Simply alleging, "Defendants Press and Silver proposed a $10 million line of credit," "Defendants Press and Silverman later proposed to Jarnagin," and "Defendants Press and Silverman issued a sham default letter" is insufficient. D.E. 24 ¶ 138(a)-(d). There must be "a sufficient statement of each defendant's specific conduct." *Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*, No. 10–22153–CIV, 2011 WL 4434891, at *3 (S.D.Fla. Sept. 23, 2011) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir.1997) ("In a case involving multiple defendants ... the complaint should inform each defendant of the nature of his alleged participation in the fraud."). In responding to Defendants' Motion, Plaintiffs' argument that "both Press and Silverman participated" in the telephone conversations and the issuance of the sham default letters is not enough. Defendants are entitled to know the specific allegations that are being brought against each individual Defendant, and as pleaded, Plaintiffs have failed to allege each Defendant's participation with particularity.

Second, Defendants argue that Plaintiffs have failed to plead the purported predicate acts attributable to Press and Silverman with the requisite specificity, specifically the "who, what, when, where, and how of the allegedly false statements." In paragraph 138, Plaintiffs plead the following predicate acts of wire fraud in violation of 18 U.S.C. § 1343:

a. Defendants Press and Silverman proposed a $10 million line of credit for LCTI, C & I, SEP, and WKMS to

---

Plaintiffs set forth conclusory allegations in paragraph 139(a)-(d) of Plaintiffs' First Amended Complaint and do not cite any case law that would persuade this Court that Plaintiffs sufficiently pleaded a valid cause of action for the "collection of an unlawful debt."

Therefore, to the extent Plaintiffs rely upon the predicate acts of "collection of an unlawful debt" to fulfill the "predicate acts" requirement, the Court finds this argument fails.

Jarnagin by telephone and by e-mail, on or about October 19, 2013, despite knowing that TCA's corporate charter did not permit TCA to loan the full $10 million and, in fact, intending that TCA never would do so;

b. Defendants Press and Silverman later proposed to Jarnagin, by telephone and by e-mail on or about October 16, 2014, a $10 million line of credit for Viridis despite knowing that TCA's corporate charter did not permit TCA to loan the full $10 million and, in fact, once again, intending that TCA never would do so;

c. Defendants Press and Silverman issued a sham default letter dated September 2, 2014, and Defendant Silverman communicated via telephone and via e-mail on or about September 3, 2014, with a third-party lender in Florida named Trade Finance Solutions, Inc. in order to dissuade same from paying off the indebtedness owed by Plaintiffs LCTI, C & I, SEP, WKMS, and Ideal pursuant to the Original Loan and its First Amendment;

d. Defendants Press and Silverman issued a sham default letter dated May 1, 2015, despite knowing that it was baseless, upon learning that Jarnagin could potentially pay off the Viridis/Beckford Loan with another lender located in Texas. Press directed Silverman to tell Jarnagin, via telephone, on or about April 2015, that Viridis was in default, and to threaten to issue a formal Notice of Default unless Jarnagin agreed to sign a statement that Viridis and Beckford were liable for the $4.1 million in illegal, usurious interest provided in LCTI's $4.1 million Fee Note. When Jarnagin refused, Press and Silverman issued the sham default letter,

and Jarnagin's efforts to refinance with the Texas lender failed.

D.E. 24 ¶ 138(a)-(d).

The Court does not entirely agree with Defendants' argument that "Plaintiffs' allegations fail to distinguish and identify specific and individual actors, actions, intentions, dates, locations, and manner." For similar reasons this Court found Plaintiffs failed to allege an "enterprise" under the RICO statutes, the Court also finds that Plaintiffs have failed to precisely identify which Defendant made the misrepresentations that form the basis of the predicate acts of mail/wire fraud. Rather, Plaintiffs have lumped together the Defendants and failed to meet the heightened pleading threshold. In considering the remaining elements, however, the Court is satisfied that Plaintiffs have sufficiently identified the time, place, and manner in which these alleged misrepresentations have occurred. For this reason, the Court finds that Plaintiffs have failed to state a cause of action.

### 4. *"Pattern" or Threat of "Continued" Criminal Activity for RICO Claim*

An essential element of any RICO claim is a "pattern of racketeering activity." *Jackson v. BellSouth Telecomm.,* 372 F.3d 1250, 1264 (11th Cir.2004). The Eleventh Circuit Court of Appeals has found that "[t]o successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Id.*

"To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc. v. North-*

*western Bell Tele. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893 (citing *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (1987)). To establish the predicate acts were of a continuing nature, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. 2893. In other cases, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242–43, 109 S.Ct. 2893. As the Supreme Court has found, "the continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purpose), or of conducting or participating in an ongoing and illegitimate RICO 'enterprise.'" *Id.* at 243, 109 S.Ct. 2893.

Defendants argue that Plaintiffs' alleged six (6) predicate acts do not show a "pattern" of a "continuing" nature. In opposition, Plaintiffs argue that they have sufficiently alleged facts to establish closed continuity by describing "eight specific predicate acts committed by Press and Silverman over a period of two years, for the purpose of perpetrating an illegal lending scheme wherein they committed wire fraud and engaged in the collection of an unlawful debt," and sufficiently pleaded open-ended continuity "by specifically alleging that the predicate acts committed by Press and Silverman are part of TCA's regular way of doing business."

As pleaded, the Court finds that Plaintiffs have adequately alleged closed-ended continuity, but failed to allege open-ended continuity. In support of their argument that they have pleaded open-ended continuity by "specifically alleging that the predicate acts committed by Press and Silverman are part of TCA's regular way of doing business," Plaintiffs point to paragraphs 129–131. In paragraph 129, Plaintiffs allege "[u]pon information and belief, almost every company that borrows money from TCA is subject to the same kind of circular predatory lending scheme and has been sent a strategic notice of default at some point during the relationship in order for TCA to attempt to obtain an unfair strategic commercial advantage over its debtor and in furtherance of collecting debt." D.E. 24 ¶ 129. Plaintiffs then proceed to list a number of entities that received lines of credit from TSA, but Plaintiffs fail to allege sufficient facts, which if accepted as true, could be construed as amounting to a "pattern" of racketeering activity. *Id.* ¶ 130. The Court finds Plaintiffs' allegations in paragraphs 129–131 to be conclusory, and therefore, Plaintiffs have not sufficiently alleged an open-ended continuity.

The Court is satisfied that Plaintiffs have sufficiently alleged closed-ended continuity. As the Eleventh Circuit has stated, "[t]he target of RICO is … not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." *Jackson*, 372 F.3d at 1264. Moreover, in defining "pattern," Congress announced, "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of

commission, or other are interrelated by distinguishing characteristics and are not isolated events." *Id.* (citing *Sedima, S.P.R.I. v. Imrex Co., Inc.*, 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). In their Amended Complaint, Plaintiffs allege four predicate acts committed by Press and Silverman over a period of two years, for the purpose of perpetrating an illegal lending scheme wherein they allegedly committed wire fraud. D.E. 24 ¶¶ 36–126, 131, 138–39. The Court is satisfied that these allegations are sufficient to establish a pattern that such acts had a "same or similar purpose[ ], result[ ], participants, victims, [and] method of commission" as required to state this element of a RICO claim. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir.2004). Accordingly, Plaintiffs have adequately alleged that Defendants' acts possessed closed-ended continuity for purposes of stating a RICO claim.

### 5. *Pleading Civil RICO Conspiracy under 18 U.S.C. § 1962(d)*

■■■■ In order to state a civil RICO conspiracy claim, a plaintiff must "allege an illegal agreement to violate a substantive provision of the RICO statute." *Super Vision Intern., Inc. v. Mega Intern. Comm. Bank Co., Ltd.*, 534 F.Supp.2d 1326, 1342 (S.D.Fla.2008) (citing *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1269 (11th Cir.2004)) ("To be guilty of conspiracy ... parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law."). If there are no new allegations, then because a plaintiff failed to state a RICO claim, the conspiracy claim must necessarily fail. *See Rogers v. Nacchio*, 241 Fed.Appx. 602, 609 (11th Cir.2007) ("Thus, where a plaintiff fails to state a RICO claim and the conspiracy count does not contain addition-

al allegations, the conspiracy claim necessarily fails."). As articulated by the Eleventh Circuit, where the complaint fails to state a substantive RICO claim, a RICO conspiracy allegation "simply concludes that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation." *Jackson*, 372 F.3d at 1269.

■■■ Furthermore, to state a claim for civil RICO conspiracy, a plaintiff "must allege facts to support an agreement to violate a substantive provision of the RICO statute." *Super Vision*, 534 F.Supp.2d at 1343 (citing *Carter v. MGA, Inc.*, 189 Fed. Appx. 893, 894 (11th Cir.2006)) ("But plaintiffs alleged no facts to show or to create a reasonable inference that Defendants made an agreement. Plaintiff's conclusory allegations that Defendants conspired with each other are insufficient to survive a motion to dismiss.")

Defendants argue that Plaintiffs failed to allege any agreement between the Defendants to violate any RICO laws. D.E. 33. Plaintiffs argue that they are not required to allege the existence of a specific "agreement" to violate RICO in order to state a conspiracy claim under 18 U.S.C. § 1962(d). D.E. 50. In responding, Plaintiffs cite to a number of allegations distributed among the numerous paragraphs throughout their Amended Complaint and contend that they have detailed the scheme in the Complaint, which amounts to "TCA's business model." D.E. 50. Plaintiffs further argue, "Press and Silverman's roles in connection with the overall objective of the conspiracy (which is TCA's business model) is alone sufficient to adequately allege a conspiracy claim under section 1962(d)." *Id.*

The Court is not persuaded by Plaintiffs' arguments. First and foremost, because Plaintiffs have failed to adequately state a

claim under section 1962(c), the Court must necessarily find that Plaintiffs failed to state a claim for civil conspiracy under the RICO statutes. Notwithstanding this, the fact that Plaintiffs failed to allege that there was an agreement between Press and Silverman to commit a criminal act is a glaring deficiency in Plaintiffs' pleading of a civil conspiracy claim under RICO. Whether Plaintiffs would ultimately prove at trial that there was an agreement through direct or circumstantial evidence is not an issue that will be considered by this Court on a motion to dismiss. Plaintiffs' argument that they are "not required to allege the existence of a specific 'agreement' to violate RICO in order to state a conspiracy claim" is outwardly rejected by a plethora of case law within this Circuit. *See Amer. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir.2010) ("A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant *agreed* to the overall objective of the conspiracy; or (2) by showing that the defendant *agreed* to commit two predicate acts."); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir.1997); *United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992); *In re Managed Care Liti-gation*, 430 F.Supp.2d 1336 (S.D.Fla.2006); *Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir.1998).

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss the First Amended Complaint (D.E.33) is GRANTED. Counts I and II are DISMISSED WITHOUT PREJUDICE. Plaintiffs are provided leave to amend their complaint to correct the deficiencies addressed in this Order, if they so desire, and SHALL file their Second Amended Complaint on or before **Friday, *January 8, 2016***. It is further

ORDERED AND ADJUDGED that Plaintiffs' state law claims (Counts III–X) are DISMISSED as this Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over these claims arising under state law.

DONE AND ORDERED in Chambers at Miami, Florida, this 17th day of December, 2015.